IDA V. WILLGUES, Administratrix of Estate of LOUIS M. WILLGUES, v. PENNSYLVANIA RAILROAD COMPANY, Appellant.—298 S. W. 817.

Division One, October 10, 1927.

*Harkless & Histed* for appellant.

32

*C. A. Randolph, Rosenberger, McVey & Freet* and *John C. Sheriff* for respondent.

34

GANTT, J.—This is a suit by Ida V. Willgues, widow and administratrix of Louis M. Willgues, deceased, under the Federal Employers' Liability Act, against the Pennsylvania Railroad Company and the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, for the death of Louis M. Willgues while switching freight cars in the Scully Yards, near Pittsburgh, Pennsylvania. The case was dismissed as to the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company, and a verdict was returned against the Pennsylvania Railroad Company for $20,000, which company appealed.

Eight grounds of negligence are alleged in the petition, but only two grounds were submitted to the jury, as follows:

First, that a switchman was at fault in not throwing a switch and diverting the car on which Willgues was riding, to a clear track, and in not giving a warning signal to Willgues that standing cars were ahead on the track; second, that appellant was negligent because it did not properly instruct Willgues how to control cars moving down the hump and into the yards, for classification.

The answer is (a) general denial, (b) assumption of risk, (c) contributory negligence, (d) and that before respondent was appointed administratrix of her husband's estate in the Probate Court of Jackson County, Missouri, the Orphans Court of Allegheny County, Pennsylvania, appointed Ellen Willgues, of Ohio, the mother of Willgues, administratrix of his estate; that said court found the jurisdictional facts necessary to authorize it to make the appointment and to take charge of the estate; that this cause of action was thereby placed under the control of Ellen Willgues, administratrix; that said administration was still in force and open; that the respondent could not maintain this action, and that the proceedings in Pennsylvania were entitled to full faith and credit; that a settlement had been made by the Pennsylvania administratrix with appellant for the sum of $500, and a receipt and full acquittance taken,

releasing appellant from liability; that said settlement remains in full force and effect and is a complete bar to respondent's cause of action against appellant, and that the appointment of respondent as administratrix is fraudulent and void.

The reply was a general denial, and a charge that the release was procured without the knowledge or consent of respondent, and that it was the result of fraud practiced upon said Orphans Court, is without consideration and null and void.

I. Appellant contends the court should have given an instruction in the nature of a general demurrer, at the close of all the evidence. It is also contended the court erred in giving instructions numbered 1 and 2 at the instance of respondent. It is not claimed the petition does not state a cause of action, and it is not claimed the instructions do not correctly declare the law. The instructions follow the charges of negligence in the petition. It is claimed there is no evidence to sustain these charges. Therefore, these assignments of error will be considered as one assignment, for they rest on the contention of appellant that the evidence does not make a case for the respondent. Appellant tendered no instructions to be read to the jury, but argued the case on the instructions given at the instance of respondent. There was no testimony in the case with reference to the alleged negligence except that of the employees of appellant, who were called as witnesses by the respondent.

On demurrer the facts are admitted to be as follows:

Willgues was given employment by appellant, at Pittsburgh, Pennsylvania, as a freight brakeman, on the 27th of July, 1920. After making four or five runs as a brakeman, he was transferred to the Scully Yards, in Pittsburgh, to work as a hump rider. The hump is elevated ground running in an easterly and westerly direction through Scully Yards. Trains of appellant arriving at Pittsburgh come into the yards south of the hump for classification into outgoing trains made up in the classification yards north of the hump. The manner of operation is as follows: A string of cars is pushed by a switch engine up the south side of the hump to the top of the hump. A conductor is in charge at the peak of the hump. When the cars reach the top, riders (about fourteen in number) take their turn in riding cars down the north side into the classification yards. Scales are located at the top, and the cars are weighed as they pass slowly over the scales. A rider boards the car and locates himself at the brake before the car reaches the scales. When the car reaches the peak it is uncoupled by the conductor, and it rolls by gravity across the scales at about two miles per hour and down the north slope into the classification yards. The speed of the car is controlled solely by the hand brake. Cars run down the north side on a single track, known as the "lead track," for a distance of about four hundred feet

to the junction switch. At that point the lead track divides into two tracks, known as the east and west ladder tracks. Classification tracks branch off from these tracks as they continue north from the junction switch. The first classification track branching to the left from the west ladder track is 40, the switch point of which is about 140 feet north of the junction switch point. The second classification track leading to the left from the west ladder track is 42, the switch point of which is about 210 feet north of the junction switch point. Then come 44, 46, and so on as the west ladder track continues north. The first classification track branching to the right from the east ladder track is 68, the switch point of which is ninety-five feet north of the junction switch point. These switches are operated by hand and controlled by two switchmen. Switchman Northy controls the junction switch and switches 40 and 68. His shanty is located even with and a few feet east of the junction switch. Switchman Klopman controls switches 42, 44, and other switches leading off the ladder track to the north. His shanty is located twenty-eight feet northwest of switch stand 42. Each switch stand is equipped with a target presenting a yellow light when the classification switch is open, and a white light when the switch is closed and set for the ladder track. Three switch lists, made in triplicate originals, which showed by name and number the classification track to which each car was destined, were used on Scully Hump. Klopman, Northy and Golby, the conductor on top of the hump, each had a list. On the morning of the 3d of August, 1920, Willgues reported for duty to conductor Golby, who had charge of the hump riders at Scully Hump. He told Golby he had no experience as a hump rider, and that he had only a few days' experience in railroading. Golby told him not to get excited in doing the work, and that he would put an experienced man on the car with him until he knew how to ride the hump. This was the only instruction Golby remembered giving Willgues. He turned him over to Thompson for instructions. Thompson made two or three trips down the hump with Willgues. On these trips Willgues sat on the edge of the car while Thompson handled the brake wheel. The only instructions given by Thompson were to show how to stand on the footboard, how to handle the brake club, and warned him not to let the car get beyond his control. Conductor Golby testified he told Riley, Horn and, he thought, one or two others, to ride cars with Willgues. These men did not testify, and it is not known if they rode cars with Willgues. Shortly after noon on the 3d of August, 1920, Willgues rode his first car down the hump alone. He did not have full control of the car, for it bumped into some standing cars and knocked coal from a car. He made his second trip about 12:30 P. M. on a large hopper car loaded with coal. The brake and platform were on the front end of the car. Thompson was riding a large hopper car ahead of Willgues, and the brake

and platform were on the rear end of the car, causing Willgues and Thompson to face each other as the cars went down into the yards. Willgues's car was cut off by Golby and started down about forty feet behind Thompson's car. Although Golby generally informed the rider of the track destination of the car he was riding, he did not give Willgues this information. Thompson's car blocked Willgues's view of the switch light until Thompson's car was diverted at the junction switch to the east ladder track. Willgues's car was diverted at the junction switch to the west ladder track, and there was a car ahead of Thompson's on the west ladder track for classification track 40. This car blocked Willgues's view of the switch light at switch stand 42, which was the next switch, until it cleared track 40. In other words, the junction switch was first set by switchman Northy for the west ladder track until the car destined for track 40 cleared the switch. He then threw it for the east ladder track for Thompson's car. When Thompson's car cleared the switch it was again thrown, allowing Willgues's car, instead of continuing to follow Thompson, to run down the west ladder track following the car destined for track 40. When the car ahead of Willgues on the west ladder track cleared 40, Northy threw switch 40, and Willgues could then see, for the first time, that his car was set for track 42, and could see that about twenty-two cars were standing on 42 from sixty to 200 feet (estimated by witnesses) ahead of him. It was the practice of switchmen Northy and Klopman to warn riders when there was not more than 200 feet space between the switch and the nearest standing car on a track, regardless of the speed of the car. This warning was given by a steady signal executed by spreading the arms apart if the rider were looking; and, if not, to call to him, "There is not much room where you are going." No warning or signal was given Willgues. Thompson, from the car he was riding, observed Willgues as he came down the hump, and testified he got along very well until he was in a position to see that his car was set for track 42, and that cars were standing on that track. Willgues then attempted to set the brake, but his efforts did not appear to reduce the speed of the car. He continued to work at the brake until he jumped or fell from the car. Switchman Klopman was standing between the ladder tracks, near the switch stand of track 42, as Willgues's car came down the west ladder track, for the purpose of throwing the switch when Willgues's car cleared the switch of 42, and he did throw the switch immediately after the car cleared the switch. Klopman admitted seeing Willgues when the car was 100 feet away and observing that he was working at the brake to control the car which was going from ten to fifteen miles per hour, and testified he intended to talk to him about the way he was handling the cars when he came back. Riders sometimes lost control of

cars, and for that reason the lead and ladder tracks were kept clear of standing cars for the entire length of the yards. If a car were not under control, the switchman could line up the switch for the ladder track, and the car would run down a clear track. After Willgues cleared track 42 and was continuing toward the standing cars thereon, at a speed of ten or fifteen miles per hour, he fell or jumped from the brake footboard to the track, in front of the car, and was instantly killed by the car running over him. The car continued on and bumped violently into the standing cars. No defects were found in the car, and the brake was found to be released. All types of cars go over the hump—some loaded, some empty, some with new brake shoes, some with brake shoes worn, some with brake rigging that worked hard and some easy, some with brake chain fastened directly to the brake staff and others by way of a pulley at the end of the rod, some with slack in the chain, and some with no slack, some with a new brake shoe and an old shoe on the other side which might prevent the latter from pressing against the wheel. All of these factors enter into the ease or difficulty with which a rider controls a car going down the hump. Sometimes a brake chain will wrap unevenly around the brake staff and engage against the side of the stirrup in which the brake staff rests, thereby preventing the turning of the brake wheel before the brake shoes reach the wheel of the car. This condition causes the inexperienced to believe that the brake is applied to the wheels. To correct this condition the rider should rapidly unwind the brake and wind it again. Other facts will be noted.

(a)  Appellant insists there is no evidence to sustain the charge of negligence that switchman Klopman should have thrown the switch and thereby diverted the car ridden by Willgues onto a clear track. On this question it is argued, as follows:

"Now, there is not a particle of testimony in the case that Klopman knew or could have seen or had any notice of the fact that Willgues in coming down the switch and tracks, before he got onto the switch, was not in control of his car, and was not at his proper place at the brake, or that any necessity whatever or suggestion of any kind existed that anything was the matter with Willgues in bringing down his car or that there was any necessity for throwing any switch even if it could have been done. Klopman's testimony, undisputed, is that he first noticed and saw Willgues when he got opposite to where he, Klopman, was standing further south of his shanty and at a time when the car upon which Willgues was riding and taking down had already passed the switch point and was already down on the track 42 opposite to where Klopman stood, and he says that he noticed that Willgues seemed to be excited as he passed him

and that he thought that he had lost control of his car and that he would try and caution him when he came back, but that deceased was then at his brake when he passed him.''

This statement of the facts and argument are not supported by the evidence. Switchman Klopman's shanty is 226 feet north of switchman Northy's shanty. Northy was standing in front of his shanty when Willgues passed on his last trip, and he testified, as follows:

''Q. What switches was it your duty to operate on the day of Willgues's death? A. Junction switch, 68 and 40 switches.

''Q. Did you see Willgues riding past your shanty on the trip on which he was killed? A. Yes, sir.

''Q. When Willgues went down the hump on that trip on which he was killed, where was it Mr. Klopman's duty to be? A. Handy around No. 42 switch, to close it after the car went in there.

''Q. Did you see Klopman at or about the time Willgues's last trip was passing your shanty? A. Yes, he was down between 42 and 44 switch, near to 42 switch.

''Q. Where was he with reference to the ladder tracks? A. He was between the two ladder tracks.

''Q. Whose duty was it to operate 42 switch? A. Klopman's.

''Q. How did you come to look down towards Klopman when this car was passing you? A. I always look down to see if Klopman has got his switch set right. You understand when the cars go down I have to mark what track they go in, and after the car is in the right track I have to put the bills in a pigeon hole at the hump office.

''Q. When was it you last saw Klopman? A. Just about the time the car was passing me, I looked down and saw Klopman. He was going toward 42 to throw the switch, after the car would get in. He was then close to 42.

''Q. Was it Klopman's duty to watch the men riding down the hump? A. Yes, he has to watch the men and see that they put the cars where they belong. He had to watch them, for if a man came down the hump supposed to get a three car cut, and only has two cars, Klopman would have to wait until the other car came before he closed 42.

''Q. By what number, if any, was the shanty designated where Klopman's station was? A. No. 116 was his shanty.

''Q. How close to shanty No. 116 was Klopman at the time you last saw him, as Willgues's car passed your shanty, on the trip he was killed? A. I do not know how far it would be, but he would have to cross, first, the ladder and switch points of 42 and track 40 to get back to his shanty.

''Q. How close to the switch stand of switch No. 42 was Klopman when you last saw him, as Willgues's car passed you on the trip he

was killed? A. I would say about five or ten feet. Somewhere around that.''

Switchman Thompson testified, as follows:

''Q. Yes, you have told about that. Now, did you look at him again? A. Yes.

''Q. Where were you when you looked back at him again? A. I wasn't ahead of him then.

''Q. Where were you? A. I was on 'sixty-eight.'

''Q. Sixty-eight swings off there to the east? A. Yes, sir.

''Q. Yes, was he (the deceased) still behind you at that time? A. No, sir.

''Q. What track was he on at that time? A. He was on the other ladder.

''Q. On the other ladder? A. Yes, sir.

''Q. How far from you? A. About three car-lengths.

''Q. Was he still on the step of the car? A. No, sir, he never was on the step.

''Q. Wasn't—you say he never was on the step of the car he was riding? A. No, sir.

''Q. On the platform? A. You mean, the footboard?

''Q. The footboard? A. Yes, sir.

''Q. Was he still on the footboard, when you last saw him? A. Yes, sir.

''Q. What was he doing? A. Working with his brake.

''Q. Apparently trying to stop the car? A. I don't know what he was trying to do, he was working his brake.

''Q. He was working his brake? A. Yes, sir.

''Q. Did you continue to look at him? A. Yes, sir.''

Golby, Northy and Klopman knew before Willgues left the top of the hump that the car he was riding would be switched to track 42. They knew this from their switch lists. Conductor Golby did not so inform Willgues. He did not learn of the destination of his car until the car ahead of him, ridden by the man ahead of Thompson, on the west ladder track, was switched onto track 40. The switch point of 42 is about seventy-five feet north of the switch point of 40. He was running about a car-length or more behind a car ahead of him on the west ladder track. So, he must have been about 100 feet north of the switch point of 42 when he saw the yellow light on switch stand 42, and then knew his car would run onto 42, on which about twenty cars were standing. Thompson, from his car on 68, observed Willgues while he was yet on the ladder track. He was excited, working at his brake and continued to do so until he fell or jumped from the car. It was Klopman's duty to watch all the cars as they came down the hump, for he controlled the classification of cars by operating the switches. He saw, or by the exercise of ordinary care,

could have seen this car when it was about 100 feet north of the switch point on 42. Klopman knew Willgues was inexperienced. He had noticed Willgues did not control the car on his first trip down the hump. This car collided with standing cars, and coal was thrown from the car to the ground. The jury could well conclude from this evidence that Klopman had ample time to throw the switch and divert the car to a clear track.

(b) It is next contended there is no evidence to sustain the charge of negligence, that Klopman should have given Willgues the "steady signal," thereby warning him that standing cars were on the track ahead and to have his car under control. Klopman testified Willgues should have been setting his brake when he was 300 or 400 feet north of the point where he did commence to work with it. But Willgues had not been told where the car was going, could not see the switch lights for the cars ahead, and did not know of the cars standing on the track. Northy testified that when Willgues passed shanty 115 (224 feet north of shanty 116) Klopman was standing east of shanty 116, between the ladder tracks. In this position Klopman either saw, or by the exercise of ordinary care, could have seen, Willgues from the time he passed shanty 115 until he was killed. This is substantial evidence to submit to the jury the failure of Klopman to warn Willgues by signal. If he had done so, Willgues might have been able, by working with the brake at that distance, to have the car under control before it reached the standing cars. Appellant insists there was no rule or custom requiring the signal to be given. There was no rule, but Thompson and Northy testified it was the practice to give the signal that the rider might have more time to get his car under control.

(c) Appellant insists there is no evidence to sustain the charge of negligence that it did not properly instruct Willgues how to control a car going down the hump. It is claimed Willgues was given all the instructions possible. An examination of the record discloses that appellant gave to Willgues no instructions that would aid him in controlling a car. Conductor Golby told him not to get excited and that he would send an experienced man with him to teach him how to control a car. Thompson made two or three trips with him and showed him how to stand on the footboard, work the dog into the ratchet and to push on his brake stick instead of pulling on it. Two or three riders may have ridden down with Willgues. This was all that was done in the way of teaching Willgues how to control a car. The evidence discloses that it requires experience to control a car going down the hump. One should be familiar with the operation and functioning of hand brakes.

A consideration of the evidence above referred to leaves no doubt that much is to be learned before one can with reasonable safety ven-

ture to ride a car down the hump. Thompson testified an experienced switchman would discover that a brake was not working right on account of either of the various conditions referred to above by the "feeling" when he was winding the brake by the hand wheel. He further testified these conditions when discovered could be overcome by an experienced man. Now, appellant not only did not instruct Willgues about these matters, but such conditions were not even mentioned to him. From the evidence the jury would be justified in finding the brake chain had wrapped unevenly around the brake staff and caught against the side of the stirrup, thereby preventing the application of the brake shoes to the wheel.

It is argued Willgues told conductor Golby he could ride cars down the hump alone, and that he thereby passed on the question of his  own ability to do the work. Willgues based his judgment on the limited instructions given to him. He had not been told of the hidden dangers connected with the work, and he had not been taught how to overcome them. We do not think the willingness of Willgues to undertake the work relieved appellant of the duty of properly instructing him. [39 C. J. p. 486, note; King v. Woodstock Iron Co., 143 Ala. 632, 42 So. 27.] A standard text states the rule as follows:

"The master cannot be held free from negligence as a matter of law, where the testimony fairly warrants the inference that the work in question was abnormally dangerous to an inexperienced employee, and that he had received no instructions as to the particular perils to be avoided and the proper means of avoiding them.

"If the master relies on the fact that he admonished the servant of the dangers that caused the injury . . . that the warning was timely and explicit, merely going through the form of giving instructions, is not sufficient. . . . The obligation of the defendant is not discharged 'by informing the servant generally that the service engaged in is dangerous; especially where the servant is a person who neither by experience nor education has, or would be likely to have, any knowledge of the perils of the business, either latent or patent; but . . . in such case the servant should be informed, not only that the service is dangerous, and of the perils of a particular place, but, where extraordinary risks are, or may be encountered, if known to the master, or should be known to him, the servant should be warned of these, their character and extent, so far as possible." [Secs. 1153, 1159, 1160, 3 Labatt's Master & Servant (2 Ed.).]

This rule is approved in the following cases: Horne v. Atlantic Coast Line, 153 N. C. 239, 69 S. E. 132; Reynolds v. Boston & Main Railroad Co., 64 Vt. 66, 24 Atl. 134; Railroad Co. v. Binion, 107 Ala. 654, 18 So. 75; Cincinnati Ry. v. Davis, 293 Fed. 481; Louisville Ry. v. Davis, 250 S. W. (Ky.) 978; Roszina v. Howard Gas &

Coal Co., 96 Atl. 716, 251 Pa. St. 298; Grand Trunk Railroad Co. v. Ives, 144 U. S. 408.

(d)   Another objection to instructions numbered 1 and 2 is that the negligence referred to therein was not the proximate cause of his death.   We think it was a question for the jury.

II.   It is next contended appellant is denied the protection of the full faith and credit clause of the Federal Constitution by permitting respondent to maintain this action in the face of the Pennsylvania administration.   Appellant first filed only a general denial.   The question was not mentioned in its instruction in the nature of a demurrer.   It was raised in its amended answer and in the motion for a new trial.   It was not timely raised and it is not mentioned in appellant's assignments of error.

In the case of Lavelle v. Met. Life Ins. Co., 231 S. W. 616, we ruled as follows:   "It is the well-established law of this State that a litigant must raise a constitutional question, if he desires this court to consider same on appeal, at the earliest practical opportunity during the progress of the trial below, and to keep the same alive throughout the case."

The contention is overruled.

III.   Appellant contends "the title to this cause of action and ownership thereof was vested in the Pennsylvania administratrix, and the respondent, as administratrix, cannot maintain this action."   The administratrix as such has no title or interest in the subject-matter of the action.   She is a mere nominal party—a trustee of an express trust.   For convenience the personal representative is designated by the Federal statute to bring the suit for the benefit of the beneficiaries.   The amount realized from the suit is no part of the estate of the deceased. [Wells v. Davis, 261 S. W. 58; Shaw v. C. & A. Railroad Co., 282 S. W. l. c. 418; Dennick v. Railroad, 103 U. S. 11; Stewart v. B. & O. Railroad, 168 U. S. 445; Kelly v. Union Pacific Railroad, 141 Mo. App. 490, 125 S. W. 818; Hanlon, Admx. x. Leyland & Co., L. R. A. 1917A, 34.]   In the instant case no attack is made upon the regularity of the proceedings resulting in the appointment of respondent as administratrix.   The Probate Court of Jackson County determined its jurisdiction to make the appointment, just as appellant claims the Orphans Court of Pennsylvania determined its jurisdiction to appoint the mother of the decedent administratrix.   Respondent does not question the jurisdiction of the Orphans Court of Pennsylvania to appoint an administratrix.

44

In the case of Anderson v. Railway, 210 Fed. 689, it was ruled "that an ancillary administrator of the estate of a deceased employee could in good faith and with the consent of the beneficiary maintain an action under the Federal Employers' Liability Act in the State of Tennessee, notwithstanding the fact that the widow and beneficiary was' the administratrix of his estate at his domicile in Kentucky."

The Federal.act is the law of all the states, and the right to maintain the action is not limited to the personal representative appointed in any given state. Indeed, the act recognizes the fact that there may be a personal representative in more than one state, for it is expressly provided that there can be but one recovery for the same injury.

The administratrix of the estate in Pennsylvania is not complaining of this action. She finished her labors as administratrix on the 17th of June, 1921, and was finally discharged by the Orphans Court of Pennsylvania. Respondent was appointed administratrix by the Probate Court of Jackson County on the 3d of August, 1921. During the intervening time there was no personal representative of said estate.

Appellant directs our attention to cases holding that an administrator in one state has no title to property of the deceased located in another state. The rule announced has no application here because the proceeds of an action of this kind are not assets of the estate. We hold respondent is a proper party to maintain the action. This contention is overruled.

IV. Appellant next insists that the court was in error in admitting in evidence the entire record of the proceedings had in the Orphans Court of Pennsylvania. While appellant pleaded a settlement with the administratrix in Pennsylvania, it offered no evidence in support of this plea, but only introduced the records of that court showing the appointment of the administratrix. It is claimed the admission in evidence of the check showing the amount paid to the Pennsylvania administratrix and the release signed by her evidencing a settlement of the case were prejudicial in that the jury might infer said settlement was an admission of liability in the instant case. We think the court was not in error in admitting the entire record. Indeed, we do not see how it could well be separated, for the evidence tended to show, and it was not denied by appellant, that the whole purpose of the administration in Pennsylvania was to procure a settlement of the cause of action against it under the Federal Employers' Liability Act.

In the case of Pisano v. Shanley Co., 66 N. J. L. 1, 48 Atl. 618, this defendant employed the same method to be released from liability. There, as here, the foreign administration and foreign release were

pleaded as a bar to a recovery. There, as here, the respondent set up in her reply the fraud and conspiracy by which this appellant had procured the foreign administration and release. It was there stated:

"In this replication it was not necessary to deny the fact that Branchi had become an administrator in New York. His administration in that State may stand for what it is worth. The charge in substance is that the defendant fraudulently contrived with the railroad company and with Branchi to deprive the widow of the deceased and the plaintiff, the next of kin, of all rights accruing to them, and then and there confederated together to procure, without the knowledge or consent of the plaintiff or the said widow, and procured said Branchi to be appointed administrator, for the purpose of having him release all right of action vested in the personal representatives of the deceased for a purely nominal and grossly inadequate consideration, and that Branchi, carrying out the design of said conspiracy, fraudulently and secretly, without the consent of the widow or next of kin, by false representations, obtained the grant of letters in New York.

"The charge in this replication is of conduct grossly fraudulent— that it was sought to be consummated by obtaining letters of administration in New York as a means of carrying out a fraudulent design. To maintain the case set up in this replication it is not necessary to attack the grant of administration in New York, nor is it necessary to have it set aside. The next of kin in this State who are prosecuting this suit may avoid a settlement for fraud such as is charged in this replication and admitted by this demurrer, without having the letters to Branchi in New York vacated or the release set aside by formal suit. So far as this suit is concerned, the letters in New York and the release of Branchi are nullities."

This ruling is approved in the following cases: Spokane Railroad v. Whitley, 237 U. S. 487; B. & O. Railroad v. Evans, 188 Fed. 6; Anderson v. Railway, 210 Fed. 689; Aho v. Jesmore, 10 L. R. A. (N. S.) 998.

However, at the trial it was a question as to whether or not Willgues was in the employ of appellant or the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company. The check in question was drawn on the Pennsylvania Railroad Company, and the release in question recited the administratrix was releasing the Pennsylvania Railroad Company from all claims under the Federal Employers' Liability Act because of the death of Louis M. Willgues. The check tended to show Willgues was in the employ of the appellant. In addition, the release tended to show that Willgues was killed while engaged in interstate commerce, another issue which respondent was required to prove.

In the case of Sotebier v. Transit Co., 203 Mo. l. c. 721, it was ruled as follows:

"Where the evidence is competent for any purpose, it is the duty of the court to admit it when offered, and if it is desired to have it limited in its effect then it is the duty of the opposite party to ask an instruction for that purpose."

This contention is overruled.

V. It is next insisted the court was in error in giving respondent's instruction numbered 6. This instruction rests on the evidence tending to show fraud in the appointment of the administratrix in Pennsylvania and the attempted settlement of this cause of action. Appellant claims the jury were authorized to set aside a foreign judgment appointing the administratrix in Pennsylvania. We do not find in the instruction the submission of any such question. The jury were simply told if they found the facts as set forth in the instruction to be true, the appointment of the administratrix and the settlement as evidenced by the release constituted no defense. Other objections to the instruction rest on this contention. The instruction was well enough, and this contention is overruled.

VI. It is next contended the court was in error in permitting respondent to prove that chains sometimes wrapped around the brake staff and prevented the brake from functioning, and in permitting respondent to show that the foot platform was too small. We find no evidence in the record tending to show the platform was too small. Respondent was permitted to show the dimensions of the foot platform. It is not claimed the platform was either too small or too large. Appellant insists the testimony relating to chains sometimes unevenly wrapping around the brake staff and thereby interfering with the braking of the car was not admissible, for the reason there was no charge in the petition of any defective appliances connected with the brake or with the car. At the time the evidence was offered, the respondent stated in open court and before the jury that it was not claimed there was any defect in the brake or the car; that the evidence was offered to show a hidden factor necessary for a hump rider to be familiar with in order to be able to control a car. The evidence was clearly admissible for this purpose. This contention is overruled.

VII. It is next contended that the court was in error in admitting in evidence the written application of respondent to the Workmen's

Compensation Bureau of Pennsylvania for payment on account of  the death of her husband, and in admitting in evidence the Workmen's Compensation Act of Pennsylvania. The application contained a statement of the various amounts of money Willgues sent to rspondent between the time he left Kansas City and the time of his death. It is charged that the statement was self-serving. The record shows that while the whole of the application was admitted in evidence, the part complained of was not read to the jury. However, we think the application was admissible in its entirety. There were two applications filed by the widow—one against the Pennsylvania Railroad Company and one against the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company. These claims were consolidated into one claim by the filing of a joint answer by these companies, in which answer defendants denied respondent's right to claim under the Workmen's Compensation Laws of Pennsylvania, for the reason Willgues was at the time engaged in interstate commerce. The joint answer filed by these defendants tended to show a joint employment of Willgues and that he was working for both of them in interstate commerce. The employees testified they did not know whether they were working for the Pennsylvania Railroad Company or the other company. In addition, the appellant could not have been prejudiced by the admission of these statements, for the respondent had testified to sums of money received by her from the time Willgues left Kansas City to the time of his death.

We think the Pennsylvania Workmen's Compensation Law was admissible in evidence for the purpose of explaining the applications made by respondent for payment and the joint answer filed by defendants. The Compensation Bureau was constituted a tribunal with judicial administrative functions, and the law explained why these applications were filed there and why defendants would file their joint answer. The proceedings were judicial, and, consequently, the admissions contained in defendant's answer were judicial admissions. The law was offered solely for the purpose of explaining the applications and the answer and the procedure to be adopted in making a claim for compensation.

As to the admission of the pamphlet containing the rules and regulations governing the Pennsylvania System Insurance and Relief Association, we think the court was not in error, for the reason the pamphlet tended to show the Pennsylvania System comprised a number of companies, including appellant, and they were united in interest and joined together to create the Relief Association, which was operated by and subject to the control of defendants. Such testimony was admissible to sustain the issue of joint employment. Appellant leveled a blanket objection to the admission

48

of the three exhibits. If either of the exhibits is admissible, appellant's objection must fail. Appellant could have tendered an instruction limiting the effect of this testimony. [Stanard Milling Co. v. Transit Co., 122 Mo. l. c. 273, 26 S. W. 704.] These contentions are overruled.

VIII. It is next contended the court was in error in admitting in evidence a motion of respondent made at a previous term of court to require appellant to produce certain papers, pamphlets and documents, including the rules and regulations of appellant's Relief Association, and in admitting in evidence the order of court on the motion requiring the production of said papers. When respondent offered in evidence Exhibit 12 as the rules and regulations governing the Voluntary Relief Association, an objection was made and it was stated by appellant "that there is no evidence it is the rules of the company purporting to be issued at all. There is no evidence it is any regulation of any Relief Department." Thereupon, respondent offered in evidence said motion and order of court. Appellant, through its attorney, had complied with the order and delivered to respondent's attorney these documents. Therefore, it was proper to admit in evidence the motion, the order of court and oral testimony tending to show appellant had produced the papers, including the rules and regulations governing the Voluntary Relief Department under the order of court as the originals. The act of appellant in producing the papers was an admission that the pamphlet contained the rules. A similar objection was made by appellant when plaintiff offered in evidence other documents produced under said order. This contention is overruled.

IX. Oscar L. Borquist, notary public, was called by appellant as a witness. He was handed a paper writing and asked whose signature was attached to it. He answered "Ida Willgues" (respondent), and testified he saw her sign the statement. Thereupon, the statement was offered in evidence, and, on respondent's objection, the court refused to admit it. The statement tended to show that during the month of December, 1920, respondent made a trip to Texas with Charles Highfill and lived with him as his wife. The court ruled correctly. It was offered for the purpose of impeachment, and it is well settled that a witness cannot be impeached by showing the commission of specific immoral acts. [Wright v. Kansas City, 187 Mo. 678, 86 S. W. l. c. 456; State v. Lasson, 238 S. W. l. c. 105; State v. Loness, 238 S. W. l. c. 114; State v. Sebastian, 215 Mo. 58, 114 S. W. l. c. 530.]

X. It is next contended by appellant that the court was in error in admitting in evidence the testimony of an actuary who testified, by

mortuary tables, of the life expectancy of respondent and decedent at the time of his death. The question has been ruled against appellant. [Morton v. Southwestern T. & T. Co., 217 S. W. l. c. 835; Gill v. B. & O. Ry. Co., 259 S. W. l. c. 97.]

XI. It is finally contended the damages allowed are excessive. Respondent, a widow with two children, while working in a restaurant, at Independence, Missouri, met Willgues in August, 1917. He was a farm-hand and enlisted in the army at Independence, where he remained four months, and was transferred to Camp Doniphan, Oklahoma. At his request, and at her expense, she went to Lawton, Oklahoma, and married him on the 17th of April, 1918. Six days thereafter he left with his regiment for France. On his return, in May, 1919, they lived together at Kansas City and Independence until October, 1919. While he was in France respondent received from the Government $15 per month and $15 per month from his wages. When he returned he worked in a restaurant and on a farm for a short time, and worked for the May Grain Company, at Independence, for about four months, receiving $20 to $25 per week. He then went East and engaged in railroad work for appellant at $6.84 per day, and was killed after working six days. He gave to respondent money for household expenses, for clothing, and to make payments on the furniture they had purchased. When he left in October the furniture was returned for non-payment, as per contract. While he was in France and in the East she received letters from him containing small sums of money. They were twenty-three years of age at the time of his death, and each had an expectancy of 40.17 years. He was in good health, and the evidence indicates he wanted to better his condition by engaging in railroad work, for which he would receive more money. Respondent argues that the present cash value of his earnings should be based on the wages he was receiving on the day of his death. Attention is directed to the following cases: Gill v. B. & O. R. R. Co., 259 S. W. l. c. 97; Shaw v. C. & A. R. R. Co., 282 S. W. l. c. 423; Kidd v. C. R. I. & P. R. R. Co., 274 S. W. 1079. In these cases the decedents were seasoned railroad men and had regular employment. Willgues had no regular employment. He was on the extra list. In other words, he was an experiment. We think the present cash value of his earnings should be based on his earnings before he engaged in work for appellant. With this basis and giving consideration to the probability of an increase of future earnings, we hold the verdict to be excessive. If respondent will, within ten days from the filing of this opinion, enter a *remittitur* of $7,000, as of date of judgment in the trial court, the judgment will be affirmed; otherwise, the judgment will be reversed and the cause remanded. All concur.