E. C. VAUGHAN v. ST. LOUIS MERCHANTS BRIDGE TERMINAL RAILWAY COMPANY, Appellant—18 S. W. (2d) 62.

Division One, May 18, 1929.

*J. L. Howell* and *R. E. Blodgett* for appellant.

*Douglass & Inman, John H. Bradley* and *Allen V. McReynolds* for respondent.

ATWOOD, P. J.—This is an action for damages for personal injuries alleged to have been sustained by E. C. Vaughan while employed by the St. Louis Merchants Bridge Terminal Railway Company as assistant yardmaster in its yards at Madison, Illinois.

Plaintiff went to trial on his amended petition alleging therein that at the time he was injured defendant was engaged in interstate commerce and plaintiff was employed by defendant in interstate commerce. It was further alleged in this petition that "defendant maintains a large switch yard of many tracks in or near the city of Madison in the State of Illinois; that one of said tracks is known as No. 50 lead track, which runs, generally speaking, in a north and south direction: that other tracks connect with it; that tracks 57 and 58 connect with said lead track on the west side; that tracks 57 and 58 are parallel with each other and, except near the lead track,

are far enough apart so that a car can be placed on track 57 a short distance from the lead track in a position where an employee, passing it while riding in the usual and customary place for employees to ride on the side of a car or train while switching in said yard as they were being run along the lead track and onto track 58, without danger of being struck by it; that it was the rule, custom and practice in said yard on and prior to November 26, 1924, in placing cars on track 57 and other tracks in said yard, to place them far enough from the lead track so they would not strike employees riding in the usual and customary place for employees to ride on the side of cars that were being switched in said yards along the lead track and on other tracks; that plaintiff on said date and prior thereto knew of said rule, custom and practice.'' Plaintiff further alleged ''that on or about the twenty-sixth day of November, 1924, he was employed by the defendant as an assistant yardmaster and worked in said yards; that on the night of said date, while it was dark, the plaintiff, in the performance of his duties, was riding in the usual and customary place for employees to ride on the side of a car or cut of cars that was being shoved north on the lead track and onto track 58 aforesaid to be coupled to other cars standing on track 58 in order to make up a train on track 58, which said train was to be hauled from said yard to the city of St. Louis, Missouri; that, while he was riding on the side of one of the cars in the said cut of cars in the usual and customary place for employees to ride on a car or cut of cars while switching them in the yards, and while passing track 57, he was struck by a car on track 57 that had been left by defendant in a position so close to the lead track that it would not clear an employee riding on the side of a car or cut of cars that was being switched along the lead track past track 57 and onto track 58; that as a result of being struck by said car plaintiff was knocked off the side of the car and seriously and permanently injured.''

Defendant's answer was a general denial.

Plaintiff's evidence tended to prove that he was hurt about three o'clock in the morning of November 26, 1924; that he was about forty-one years of age at that time and was earning $225 a month; that he was assistant yardmaster of what was termed the south end of the westbound yards under the supervision of night general yardmaster Knight and assistant yardmaster Durkee who had an office in the north end of the westbound yard; that the westbound yard contained about forty tracks upon which cars were classified and prepared for transportation to the west side of the river into the State of Missouri; that plaintiff had been in the employ of defendant in three different departments for about eighteen years; that on the night in question plaintiff started to work at eleven o'clock P. M. and was supposed to continue until seven o'clock A. M.; that a track

called No. 50 lead ran directly north and south from which numerous switch tracks extended towards the west; that shortly before plaintiff was injured he was instructed by his superior, assistant yardmaster Durkee, to take three cars by means of pusher engine number 134 with its crew, consisting of an engineer and fireman, and place these cars, together with the caboose, on the rear of track 58 and couple them on to the "Frisco high-line," a train that is made up in the Madison yards and run to the Frisco at Twenty-third Street, St. Louis, Missouri; that after placing these cars on track 58, respondent went back to his office and telephoned the assistant yardmaster that this had been done; that about forty-five minutes later plaintiff was advised by his superior, this assistant yardmaster, that there was a broken train line sixteen cars deep on track 58 and that he should have the lead crew operating engine 168 throw out the bad-order car; that by "a broken train line" it was understood that there was a leakage of air in a car in the train; that under such circumstances the bad-order car must be set out so that the air could be connected throughout the entire train; that upon receiving this advice plaintiff walked down to track 58 to inspect the rear of this train to see that the hose was all coupled; that as he walked down to the sixteenth car the conductor of the transfer crew that was getting the train ready advised plaintiff that there was also a broken train line eighteen deep; that upon receiving this information he walked back to the office and phoned his superior about the additional bad-order car and was told to have the lead crew throw out both bad-order cars; that the method of throwing out the bad-order cars was to connect up an engine with the end of the train and pull back out on lead 50; that after this was done the bad-order car farthest away from the engine would be kicked onto another track and the good car next to it uncoupled and kicked onto another track so the two bad-order cars should be placed upon the bad-order track, and thereupon the train would again be connected up with the good-order car, and it would then be plaintiff's duty to take the engine and the sixteen cars and couple them onto the rear end of the train on track 58, then couple up the air hose and come back to the engine in order to test the air on the train; that after these bad-order cars were kicked out in this manner, the engineer on the pusher engine was given the signal to back down the lead and shove the remaining sixteen good cars onto track 58, this movement being to the north, the engine being headed south with the engineer on the west side of the engine; that when they were ready to start this movement plaintiff assumed a position on the ladder on the south end of the car next to the rear car; that the switches were standard, about eight feet between the inner rails; that cars passing over parallel switches from the lead track would be closer together on the curve than they would be

after passing the curve; that after plaintiff assumed this position, which was usual and customary in such work, he gave the engineer a signal to back down the lead to the north onto switch track 58; that plaintiff assumed this position for the purpose of signaling the engineer in case of any emergency; that plaintiff was holding to the ladder with his left hand, with his lantern in his right hand, and facing the engineer; that it was his duty to maintain this position so he could watch the engineer; that just about the time plaintiff turned into the curve on switch track 58, about ten feet from the lead track, a car on the south end of track 57 struck him on the head and side and knocked him beneath the train, where he was rolled for about half a car-length, and his right arm was torn and severed midway between the wrist and the elbow, so that afterward it had to be amputated between the elbow and shoulder, and he was also injured about the head. Other portions of the record will be referred to in the course of this opinion. The jury returned a verdict in plaintiff's favor for $50,000, for which amount judgment was rendered against defendant.

Appellant here urges that the trial court erred in refusing defendant's instructions in the nature of demurrers to the evidence at the close of plaintiff's case and the close of all the evidence; and that the verdict was grossly excessive. Under the first head appellant insists that plaintiff's case fails for the reasons, first, that there is absent a showing of negligence on the part of the master; and, second, that the doctrine of assumption of risk clearly applies under plaintiff's own evidence.

It is apparently conceded that this case comes within the provisions of the Federal Employers' Liability Act. In support of their contention that the demurrers to the evidence should have been sustained counsel for appellant say that plaintiff was "the chief officer in charge of the portion of the yard involved in this suit;" that it was his duty "to keep a watch and give a signal to the engineer in case of any emergency;" and that it was therefore "the clear duty of respondent to see that the train would have a clear track and, upon the discovery of any obstacle which would foul the track, it was his clear duty, according to his own testimony, to signal the engineer, because in such an event an emergency would arise." On cross-examination plaintiff did say that he had supervision of the lead crew and that the car on track 57 which struck him was placed there by the lead crew; but he further testified that it was no part of his duty to see where cars were placed on the switches there in the yard; that the foreman of the lead crew and the two helpers made up their own "racket" or classification list and switched the cars accordingly; that plaintiff had no record of where these cars were going, this being the lead foreman's duty; and that there was an absolute rule, custom

and practice then in force that in placing cars from the lead onto the side switches all lead foremen should leave the cars in the clear so they would not come in contact with another car on an opposite track or a man on the side of a train. Plaintiff pleaded negligence on the part of defendant in the violation of this rule, custom and practice then observed in said yard. In the face of plaintiff's testimony tending to prove this allegation, and that it was not his duty to see where the lead crew placed cars on the switches with reference to clearance but that such was the duty of the lead foreman, a demurrer to the evidence on the theory that there was no evidence of any negligence on the part of defendant was properly overruled. In O'Brien v. Luckenbach S. S. Co., 293 Fed. 170; Davis v. Scroggins, 284 Fed. 760; Johnson v. Brick & Coal Company, 276 Mo. l. c. 50, and other cases, there are holdings that justify the conclusion that plaintiff had the right to assume that defendant would not imperil his safety by permitting or causing the car upon which he was riding to be struck by other cars without notice or warning to him, and that he was under no duty to exercise care to discover dangers not ordinarily incident to the employment but which resulted from the employer's negligence. Redmond v. Railroad, 225 Mo. 721; Roberson v. Railroad, 213 S. W. (St. L. Ct. App.) 873; Railroad v. Wright, 235 U. S. 376; Director General v. Bennett, 268 Fed. 767; Railroad v. Hammond, 7 Fed. (2d) 1010; Mackenzie v. Railroad, 211 Mass. 586; Pierce v. Railroad, 216 Mass. 129, and Parmelee, Admr., v. Railroad, 215 Mass. 294, hold that it is an act of negligence on the part of a railroad company to leave cars on switch tracks so close to a lead track as to endanger the safety of its employees passing it while riding on the side of a car in the usual and customary place for employees to ride, especially when it is the rule, custom and practice to leave cars with sufficient clearance for employees riding on the side of another car to pass them in safety.

Appellant also calls attention to the record showing that immediately prior to the time plaintiff was injured pusher engine 134 had taken out the two bad-order cars from track 58 onto lead track 50 and at no time had fouled any car on any other track. There is no complaint that the engine fouled any car at any time. Plaintiff says he was hurt because a car was left on switch track 57 so near lead 50 that it would not clear a man riding in the usual and customary place on the side of a car going from lead 50 onto switch 58. He further testified that he was not riding the cut of cars when the two bad-order cars were taken from track 58 and there is no evidence that anyone was then riding any of those cars. In fact, lead foreman Hayes, who moved this out, said they worked on the ground. Appellant also adverts to the record showing that there was no movement of cars onto track 57 between the time the two bad-order cars

were being moved out of 58 and the time the cut of cars upon which plaintiff was hurt was being moved back onto track 58. We do not think this is material because plaintiff testified that nearly an hour had elapsed from the time he placed the three cars and caboose on track 58 and the time he was directed to have the two bad-order cars moved, and that "an engine, in an hour's time, classifies at least forty cars, on average switching."

The authorities cited in support of appellant's claim that the evidence showed no breach of duty on the part of defendant are Toledo, St. Louis & Western Railroad Co. v. Allen (U. S. Sup.), 72 L. Ed. 513; Randall v. Railroad, 109 U. S. 478; and Aerkfetz v. Humphreys, 145 U. S. 418. None of these cases involved the violation of a well known rule, custom and practice upon the observance of which plaintiff had a right to rely. The controlling feature of these cases is, as stated in the Allen case (1. c. 516), that plaintiff's knowledge of the situation and the dangers existing was at least equal to that chargeable against the defendant. In the Allen case the closeness of the tracks was a fixed structural condition in the yard that existed at the time plaintiff went to work, and did not arise from the negligent act of an employee in the progress of the work. The same may be said of the Randall case. In the Aerkfetz case the injury occurred on tracks where engines were constantly moving back and forth, and was not traceable to a negligent act of an employee in doing the work. On the other hand, the evidence in the instant case shows that plaintiff had nothing to do with putting the car that hurt him on track 57; that he did not know of its dangerous proximity to the lead track and to track 58; and that it was not his duty to see where cars were placed on the switch tracks. The authorities above cited are not in point.

Starting with the premise that plaintiff was injured because of his own breach of duty in not discovering and notifying the engineer of the offending car on switch 58, counsel for appellant next insist that the doctrine of assumption of risk applies under plaintiff's own testimony and defendant's demurrer to the evidence should have been sustained. [Washington & G. Railroad Co. v. McDade, 135 U. S. 554; Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492; Choctaw, O. & G. Railroad Co. v. McDade, 191 U. S. 68; and Kane v. Northern C. Railroad Co., 128 U. S. 91, are cited.] We think the premise is unsound. As already indicated there was substantial evidence that it was not plaintiff's duty, but that of the lead foreman, to see that cars on the switches were placed in the clear. Furthermore, there was no evidence that plaintiff actually knew that the car in question was not in the clear, or that the obstruction was so obvious that plaintiff must be deemed to have known of its existence. According to the great weight of authority an employee does not assume the risk of

injury caused by the negligence of a railroad company or its employees unless he knows of the danger, or unless the danger is so open and obvious that he is presumed to know it. [Reed v. Director General, 258 U. S. 92; Railroad v. Swearingen, 196 U. S. 51; Railroad v. Mc-Dade, 191 U. S. 64; Railroad v. Horton, 233 U. S. 492; Railroad v. Hall, 232 U. S. 94; Railroad v. Ward, 252 U. S. 18; and Railroad v. DeAtley, 241 U. S. 310.] We think there was no room for application of the doctrine of assumed risk, and counsel for defendant evidently so viewed the case, for the answer filed was a general denial notwithstanding Railroad v. DeAtley, 241 U. S. 310 and Railroad v. Kelly, 241 U. S. 485, hold that in actions based upon a Federal statute which are triable in state courts local rules of practice and procedure are applicable, and Adams v. Railroad 229 S. W. (Mo. Sup.) 790, l. c. 795, and Halt v. Railroad, 279 S. W. (Mo. Sup.) 148, l. c. 152, hold that assumption of risk in order to be available as a defense must be pleaded by defendant.

We now come to the question raised as to the amount of the judgment. Plaintiff's right arm was so crushed that it had to be amputated between the elbow and shoulder the day he was injured. Plaintiff also suffered a skull fracture which for some time seemed to affect his mind and finally left him with a lump on the back of the head and hearing impaired to the extent of one-third to one-half. He was in St. Elizabeth's Hospital at Granite City from November 26th, the date of the accident, until the 13th of the following January. He thereupon returned to his home where he suffered almost continuously from severe pains in the injured arm and head and was under the care of several physicians until the following October, when the pains in the arm were greatly reduced by an operation in which nerves were taken out of the formation on the end of the bone. Plaintiff also testified that his hospital bill and the expense of the last operation amounted to $150. and he incurred other doctor bills and expenses for medicine; that during the summer his wife and he had a barbecue stand, but there was very little work that he could do on account of pain. He was still suffering from pains in the arm and head and was taking a light treatment for the arm at the time of the trial in January, 1926, but there was no proof of permanent mental disability or permanent total physical disability. The permanent physical injuries proved were the loss of the right arm and impairment of hearing.

While plaintiff because of these disabilities cannot in the future qualify as an able-bodied man in railroad service, it by no means follows that he will not be able to do anything for a livelihood. Hence, the suggestion of his counsel that under his life expectancy of 26.76 years at the monthly wage of $225 which he was then earning plaintiff would be entitled to about $53,000, is by no means convinc-

ing. Among the authorities cited by respondent in support of the reasonableness of this verdict is Bosher v. International Ry. Co., 15 Fed. (2d) 388, decided in 1926. There a verdict for $54,000 was allowed to stand for $45,000. In that case plaintiff, a passenger, had a leg severed in a collision between two electric cars operated by defendant. While in the wreckage his leg bled profusely and his other foot was severely crushed. The crushed leg was amputated and the crushed foot given treatment. He remained at the hospital under treatment for a period of ten months and during that time suffered great pain necessitating frequent hypodermic injections. It was doubtful whether an artificial leg could be applied without continuous pain in its use, and if so an additional amputation would be necessary. The arch of plaintiff's left foot was eliminated by the crushing of the bone and resultant treatment. Three operations were necessary to arrest infection in the foot, and one of the surgeons testified that only about one-fourth of its weight-bearing power remained, and there was a probability that this leg might also have to be amputated. The evidence thus strongly indicated future pain and total disability. In a long line of cases we have held that where the only permanent injury was the loss of a limb an award of damages in excess of $10,000 would not be allowed to stand. [Kibble v. Railroad Co., 227 S. W. (Mo. Sup.) 42.] But in Mattice v. Terminal Railroad Assn. of St. Louis, 270 S. W. 306, decided in 1925, a case falling within the provisions of the Employers' Liability Act, we approved a judgment for $15,000 for a crushed hand and wrist that rendered the right arm practically useless. Also, in Greenwell v. Ry. Co., 224 S. W. (Mo. Sup.) 404, a judgment in a case under the Employers' Liability Act for $45,000 for the loss of a leg above the knee was allowed to stand for $15,000, the plaintiff being a railroad engineer, forty-six years of age and earning $175 a month.

Taking into consideration all proper elements of damage in the instant case we think the judgment is excessive by $25,000. However, the record discloses no indication of bias or prejudice on the part of the jury and no untoward incidents are complained of in the trial. Since the able opinion of BLACK, C. J., adopted by this court in banc in 1894, and reported in 123 Mo. l. c. 238, we have followed the trend of modern judicial decision which in such cases gives the respondent the option to take his judgment for what the appellate court deems to be the proper sum, and thus end the litigation. If, therefore, the plaintiff will within ten days enter here a *remittitur* of $25,000 the judgment will stand affirmed for $25,000 as of the date of the original judgment; otherwise, the judgment will stand reversed and the cause remanded for a new trial. All concur.