ROBERT DOWNEY JONES v. GUY A. THOMPSON, Trustee of MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—No. 39093 —184 S. W. (2d) 407.

Division Two, December 4, 1944.

Rehearing Denied or Motion to Transfer to Banc Overruled January 2, 1945.

*Watts & Gentry* for appellant.

*Mark D. Eagleton, James A. Waechter* and *Roberts P. Elam* for respondent.

734

WESTHUES, C.—Plaintiff obtained a judgment in the circuit court of the City of St. Louis against the defendant, Missouri Pacific Railroad Company, in the sum of $18,521, as damages for personal injuries sustained on April 8, 1943. Defendant duly appealed.

Two points were briefed by appellant: First, that the judgment should be reversed because the evidence did not establish any legal liability; second, that the verdict of the jury was grossly excessive.

We will first dispose of the question of legal liability. We think it well to state defendant's position so the point may be kept in mind when considering the facts of the case. Defendant contends that plaintiff, a railway express clerk, was injured while riding in a car in which he had no right to be, and therefore the train crew owed him no duty except not to injure him willfully after discovering his position of peril. Plaintiff was employed as a railway express messenger. On the day he was injured he was on duty in a railroad car on a Missouri Pacific train traveling between St. Louis and Texarkana, Arkansas. When the train reached Little Rock plaintiff unloaded all of the express matter from his car. This car was to be taken out of the train at that point and plaintiff was to continue on the route to Texarkana in another express car which was immediately behind the car in which he had been working. Plaintiff's car was the second from the engine. The car next to the engine was a mail storage car. When plaintiff finished his work of unloading he intended going into the express car to the rear and there continue his duties en route to Texarkana. In the brief appellant's counsel made a very fair

statement of plaintiff's evidence as to what occurred before and at the time he was injured. It reads as follows: .

"On reaching Little Rock the road engine was detached from the train and moved away to another track. The cars were all left standing on track 7, which runs approximately north and south and is immediately west of the station platform. A switch engine was then brought from the south on track 7 and coupled onto the mail storage car, which was still immediately south of the car in which plaintiff had ridden from St. Louis and was still working.

"Plaintiff had made only about six or eight trips from St. Louis into Arkansas and on about half of those runs his run ended at Little Rock and on the other half he went on to Texarkana. He had never previous to that morning gone into a mail storage car, nor had he ever had any occasion to do so. On other occasions they had, never moved the car in which he was working until he had an opportunity to get back into the car north of it.

"On the day in question, when he had passed out the last express matter from the car, he immediately started walking north in said car to get into the other express car to continue his journey to Texarkana. Before he reached the north end of his car and before he had an opportunity to leave it, the switching crew had coupled onto the mail storage car and started south with it and plaintiff's car, cutting the train in two between the car in which plaintiff had been working and the one he designated as Patton's car, in which he was to work from Little Rock to Texarkana. On all previous trips the switching crew had waited to go and find out if everything was all right before they started moving the car. Plaintiff would tell them it was all right and they would give him an opportunity to get back into the other car, which opportunity they did not afford him on that occasion. They gave no signs or anything, they just started moving before he had a chance to get into the other car. Plaintiff did not give the switchman any order or direction and they did not give him any notice whatever that the train was about to be started. Finding, before he reached the north door of his car, that the train had been cut in two between the two express cars, and the switching movement had begun, and realizing that it would have been very dangerous to try to jump from his car after it was thus pulled away from the other express car, and knowing that his express car was to be left in the yard, while his duties required him to go on to Texarkana, plaintiff changed his course and walked through his car and into the mail storage car south of it, because he thought the mail storage car was going to Texarkana, as it does most of the time.

"Plaintiff's express car had a door at each end and the mail storage car had a door at the north end, so that plaintiff could, without difficulty, walk through the south door of his car and into the mail storage car through the door at its north end. When he had gotten inside of

the mail storage car and was still walking southwardly the engine and mail storage car and plaintiff's express car were still moving south on track 7. He had walked about half of the length of the mail storage car before anything happened to him. The car then stopped suddenly and violently and plaintiff was caused thereby to lose his balance and was thrown toward the left, and thought he would have been thrown out of the car through the partly opened door had he not caught the doorjamb at the south of the doorway with his left hand, which he did, and thereby avoided falling. But the door, which had been part of the way open, slid toward the south when that stop occurred and closed upon plaintiff's left hand and fingers.

"Describing the nature of the stop that occurred, plaintiff said: 'The car gave a very sudden and most unusual stop; it was a very violent stop. I had never experienced any such stop as that before. I was experienced and ready to contend with the ordinary and usual jerks and jolts that of necessity must come with the movements of trains and in the stopping and starting of them. This stop was not anything like the usual and ordinary stops. It was a very sudden and most violent stop.' The door was a heavy steel sliding door and it struck the back of plaintiff's left hand, catching it between the door itself and the doorjamb and bounding back. The door is supposed to have two catches, one that holds it in position when it is all the way open, and the other that holds it 16 or 18 inches from the doorjamb."

The mail storage car in which plaintiff was at the time he was injured did not have any express matter in it and plaintiff had no duties to perform therein. A Mr. Haynie, an employee who handled the mail, was in the mail storage car at the time plaintiff was hurt. Defendant introduced in evidence Mr. Haynie's deposition which had been taken by plaintiff. He corroborated plaintiff as to his being hurt by the sliding of the door against his hand, but contradicted him on the point of the unusual, sudden and violent stop.

Appellant, in support of his contention that plaintiff became a trespasser when he entered the mail storage car and that the defendant was not liable, cited a number of cases among which we find Scrivner v. Mo. Pac. R. Co., 169 S. W. 83, 260 Mo. 421; State ex rel. Vulgamott v. Trimble, 300 Mo. 92, 253 S. W. 1014. In the Vulgamott case the plaintiff was a shipper of horses. He had the right, under his contract of shipment, to ride in the caboose, but chose to ride in the car with the horses and was injured. It was held and correctly pointed out that riding in the car with the horses was more dangerous and that under plaintiff's contract he had no right to be in the car where he was hurt. This court held plaintiff could not recover under the humanitarian doctrine, assuming of course that he was negligent in riding in the car with the horses. In the Scrivner case the plaintiff was a shipper of stock and had what is often referred to as a "Drov-

er's Pass'', giving him the right to ride in the caboose but not in the car with the freight. Plaintiff was hurt while riding in the freight car and this court held the railroad not liable. We cannot agree with appellant that these cases are in point. The plaintiff in this case went into a car in which there was a man at work. There was no more danger in riding in the mail storage car than in the express car. Appellant insists that plaintiff should have remained in the express car. Had he done so he would have experienced the same jolt resulting from the alleged violent stop as he did in the mail storage car. The train crew knew, or should have known, that there were men in the cars they were handling. Defendant in its brief says that if plaintiff had remained in the express car his hand could not possibly have been cut and injured in the manner it was. There can be no argument about that, but it does not so follow that he would not have been injured in some other manner. Again, defendant says in its brief that plaintiff cannot recover because of the sudden and violent stopping of the mail car because the switch crew owed him no duty while he was in that car. That argument overlooks the fact that the car in which defendant says plaintiff should have been riding was being handled in the same movement and received the same jar or jolt by the sudden stop as did the mail storage car. Plaintiff's evidence was that the crew did not give him time to go into the express car immediately behind the car in which he was working before the switching movement was begun. It may be inferred from the evidence that the employees of the express company and the employees handling the mail passed through express and mail cars whenever convenient. Note that Haynie passed through the express car when he went to work in the mail car. His testimony reads as follows:

''I came into the car from the express car and through the end of the car. I don't recollect seeing Mr. Jones in the express car at that time. I got in the side door of the express car, which would be the east side, and walked south into the mail car.''

Certainly plaintiff cannot be classified as a trespasser. But be that as it may, the ultimate fact remains that the train crew was handling two cars in which it had reason to believe and know were men, employees of the express company and employees handling mail. That being true it was the duty of the train crew to handle the cars with reasonable care. A failure to do so was negligence. 13 C. J. S. 1052, sec. 548, also page 1308, sec. 699. Plaintiff had the right to assume that the switching movements would be made with reasonable care. Therefore in riding in the mail storage car he was not guilty of contributory negligence as a matter of law as contended for by defendant. Graves v. Mo. Pac. R. Co., 342 Mo. 542, 118 S. W. (2d) 787, l. c. 791 (8, 9).

Defendant says that the sliding of the door against plaintiff's hand was the proximate cause of the injury and that since the em-

ployee in the mail car had no reason to believe or anticipate that anyone else would be in the car he was not negligent in leaving the door unfastened. The evidence justifies a finding that the door closed because of the unusual abrupt stop; that this sudden stop also caused plaintiff to lose his balance. As we view the situation the sudden and unusual stop was the proximate cause. The closing of the door and plaintiff losing his balance were the result. We, therefore, hold that the evidence supported a verdict for plaintiff.

Defendant claims that the verdict of $18,521 is grossly excessive. This has given us some concern. Plaintiff's only injury was to his left hand. He was forty-one years of age and in good health when injured, a machinist by trade. He had earned as much as $75.00 per week and as low as $30.00 per week. The express company paid him $307.75 for working from March 8 to April 8, 1943. The injury caused about a 90% loss in the use of plaintiff's left hand. A doctor testified, "Plaintiff is better off than he would be if his hand was entirely amputated at the wrist." Plaintiff's hand was badly mashed. Dr. Pernoud examined plaintiff and his evidence concerning the injury was as follows:

"The thumb is normal. There is evidence of a crushing injury about the knuckles of the left hand, and obvious amputation of the middle finger of the left hand. The index finger is retracted to the mid line; in other words, it points toward the second finger, or where the second finger was. It is in a fixed, partial flexion, and the two terminal joints are movable and normal, but the basal joint does not flex even to a right angle and does not completely extend; I mean by that, it does not straighten out and I mean it does not flex to a right angle, it does not go down to the palm of the hand so as to permit that hand in its participation of making a fist or closing the hand. That is because there has been damage, thickening to the bone of the basal knuckle joint. I would say, from a surgical viewpoint, that the left index finger is 50 per cent disabled. The middle finger is entirely gone. The ring finger is deformed and is dislocated forward at its basal knuckle joint. It rides under the normal joint surface, so that the basal joint of the ring finger is pushed forward so that the knuckle stands up high and the joint is down on the lower side or the palm side of the joint. I have been using the term 'basal knuckle joint' to mean the part of the hand that is normally considered as the knuckles. In surgery we call it the metacarpophalangeal joint. That finger also, besides being dislocated towards the palm, has been fractured and is irregular in the outline, and the finger is atrophic; I mean by that, it is somewhat wasted away and is numb, and by tests it is evident that it is devoid of nerve force. There is very little motion in that ring finger and the tip of it is hooked towards the place where the middle finger was."

"Testing the hand as a whole for strength, as determined by the strength in the other hand, I would say that as a whole the hand only retains approximately five to ten per cent of normal. strength as compared to the other hand. I think there will be some slight improvement, but not any appreciable improvement."

Plaintiff cannot in the future follow with success his occupation as a machinist. Neither will he be able to perform any duties that will require two normal hands. It is very difficult for an appellate court to determine the amount of damages in dollars and cents to compensate plaintiffs in personal injury cases. In fact that is not an easy task for anyone, including jurors. However, appellate courts should and do attempt to keep the amounts of verdicts somewhat uniform. Many cases may be found wherein .courts have required remittiturs in personal injury cases. Vaughan v. St. Louis Merchants' Bridge Terminal R. Co., 18 S. W. (2d) 62, l. c. 66, 322 Mo. 980. More to the point are the cases involving the loss of a hand or arm. Mattice v. Terminal R. R. Assn. of St. Louis, 270 S. W. 306; Radler v. St. Louis-San Francisco R. Co., 330 Mo. 968, 51 S. W. (2d) 1011; Caldwell v. Payne, 246 S. W. 312, l. c. 318 (11). In the Payne case this court held a $15,000 judgment, for the loss of an arm of a forty-one year old man, "not so excessive as to show that the jury failed to fairly weigh and consider the evidence and instructions relative to the amount of the verdict." In the Radler case this court reduced a verdict of $25,000, for the loss of the right arm of a forty-nine year old railroad employee, to $15,000. In the Mattice case a judgment for $25,000, for a crushed hand and wrist rendering the arm useless, was reduced to $15,000. In each of the above cases the injuries were of a more serious nature than those plaintiff sustained in the present case. Respondent cited Dobson v. Otis Elevator Co., 324 Mo. 1147, 26 S. W. (2d) 942; Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693; Schroeder v. Wells, 298 S. W. 806 and the Mattice case, supra, in support of the contention that the verdict is not so excessive as to authorize this court to require a remittitur. In the Dobson case a verdict for $13,000 was sustained but the plaintiff's injuries were of a more severe nature than plaintiff Jones' in this case. See 26 S. W. (2d) 942, l. c. 946 (15). In the Gordon case a judgment of $21,000 was reduced to $17,000, but the plaintiff was forced to undergo a number of operations and finally the arm was amputated above the wrist. The court also commented on the fact that plaintiff expended large sums for hospitalization. See 40 S. W. (2d) 693, l. c. 702 (16). In the Schroeder case there was a verdict for $25,000 which the trial court, by a remittitur, reduced to $20,000. It was contended in this court that the verdict was still excessive. The writer of the opinion considered the question at length. See 298 S. W. 806, l. c. 811 (3). It was held that in view of the fact that the trial court had seriously considered the question as to the amount of the verdict and had or-

dered a remittitur appellant's point should be overruled. However, this court in a per curiam, see 298 S. W. 817, ordered a further remittitur of $3,000. The injuries of plaintiff in that case were of a more serious nature than those of Jones, the plaintiff in this case. There was a complete loss of the use of the hand, a doctor's bill of $500.00 and also hospital bills. The plaintiff was a man thirty-five years old earning ten to twelve dollars per day as a carpenter. At the time of the trial it was shown that he had lost a substantial amount in earnings. Considering the question of plaintiff's damages from every angle, in view of the rulings in the above cases, and giving due consideration to the value of the present dollar and also the idea that we must to some extent harmonize the amounts of recovery, we are constrained to rule that the verdict in this case is excessive by at least $6,000. If, therefore, plaintiff will within ten days enter a remittitur of $6,000 the judgment will be affirmed for the sum of $12,521 as of the date of the original judgment, otherwise the judgment is reversed and the cause remanded for retrial. It is so ordered. *Bohling* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.