JOHN RADLER v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—51 S. W. (2d) 1011.

Division Two, July 1, 1932.

*E. T. Miller, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

*Madden, Freeman & Madden* for respondent.

WESTHUES, C.—Plaintiff in this suit seeks to recover damages, from defendant railroad company, for personal injuries, alleged to have been sustained, as the result of a fall from a railroad box-car and of the car passing over his body, severing his right arm. At a trial in the circuit court. plaintiff received a judgment in the sum of twenty-five thousand dollars ($25,000). Defendant appealed.

Plaintiff's cause of action was based on a violation, by defendant, of the Federal Safety Appliance Act. It is conceded on this appeal that plaintiff, at the time he received the injuries complained of, was engaged in interstate commerce.

Plaintiff was a member of a switching crew. At the time of the incident in question, the crew was engaged in removing loaded cars and replacing empty cars on, what is called, the house track of the

Rodney Mills, in Kansas City, Missouri. The parts of the petition, charging defendant with a violation of the Safety Appliance Act, are as follows:

". . . and by said movement started on their interstate journey and in performing the switching operations of removing said cars and placing the others on said track said crew undertook to place a certain car on said house track and it was the duty of plaintiff after said car was cut loose from the other cars to ride it to its destination and set the brake thereon and this he undertook to do and when said car had proceeded south on said house track to or near the point where it was to be placed plaintiff undertook to set the brake thereon by means of turning the brake wheel which caused a chain to wind around the base of the brake staff and set the brake and while he was in the act of doing so said chain pulled loose and gave way and as a result thereof the wheel suddenly turned around with plaintiff and he was thrown from the top of said car to the track below and said car ran upon and over him and he was injured as follows: . . .

"Plaintiff further states that the defendant was negligent in this, to-wit: that said hand brake on said car was not efficient in that said chain on said brake pulled loose and gave way as aforesaid and as a direct result thereof said wheel quickly, suddenly and unexpectedly turned around and caused plaintiff to be thrown from said car and injured as aforesaid."

Defendant's first and principal contention is that the evidence was not sufficient to show that the brake was defective, as alleged in the petition. Appellant, under points and authorities, states its position as follows:

"A. In order for plaintiff to recover it was necessary that there be substantial evidence that plaintiff was engaged in setting the brake and that while so engaged the brake chain pulled loose, permitted the wheel to turn freely, and thereby caused plaintiff to fall from the top of the car."

Plaintiff testified that, while the car was moving slowly down a slight grade, toward the point where it was to be placed on the loading or house track, he, plaintiff, turned the brake wheel until he felt a slight resistance, then waited and permitted the car to roll until it reached the point where, in his judgment, it was time to set the brake and stop the car; that when he put his force on the wheel it suddenly gave way and turned freely, causing him to fall off the car.

A number of employees of the Rodney Mills testified that immediately after the accident they saw the end of the brake chain hanging disconnected from the connecting rod. One of the mill employees, named Gibson, testified he saw plaintiff fall from the car; that he climbed upon the car and attempted to stop it with the brake in ques-

tion, but the wheel turned freely and he was unable to apply the brake.

Other witnesses testified that they heard Gibson call—"Throw something in front of the car." In response to this call, someone threw small timbers in front of the car and brought it to a stop.

This was a sufficient showing to submit the case to the jury on the theory pleaded in the petition, namely, that the brake chain pulled loose and caused the wheel to suddenly turn freely and that as a result thereof plaintiff fell from the car.

Appellant, however, to escape the force of this testimony, argues as follows:

"We say that it was a physical impossibility, a thing contrary to the laws of nature and human understanding that the brake chain could have pulled loose from the connecting rod while the brake was being set, as the plaintiff testified he was setting it, at the time he said the wheel broke loose and turned freely . . ."

Plaintiff cites many authorities to support its theory that when witnesses testify to a state of facts that are physically impossible the testimony should be disregarded. We have no fault to find with this principle of law. It was well stated by VALLIANT, J., in Weltmer v. Bishop, 171 Mo. 1. c. 116, 71 S. W. 167, as follows:

"Courts are not such slaves to the forms of procedure as to surrender their own intelligence to an *array* of witnesses testifying to an impossibility. They are not required to give credence to a statement that would falsify well-known laws of nature though a *cloud of witnesses* swear to it."

Appellant in its argument assumes that the link of the chain, making the connection with the hook of the connecting rod of the brake, was in its proper place when plaintiff turned the brake wheel and took up the slack in the chain, preparatory for setting the brake, and that, therefore, since the chain, without slack, could not back up and unhook itself, it was physically impossible for the brake chain to pull loose without some appliance breaking. There was no evidence of any break. We will attempt to demonstrate what to our minds, under the evidence, does not seem to be impossible or even improbable, and the jury might have well found and believed from the evidence. Appellant introduced in evidence exhibit three, which was filed in this court and is here before us as part of the record. This exhibit was taken from a car of the same make, as the car that figured in the accident. It consists of a part of a connecting rod, including the hook where the chain is connected to the rod, also a chain and the lower part of a brake shaft to which the chain is connected by a bolt. A turning of the brake wheel causes the chain to wrap around the lower end of the brake shaft thereby taking up the slack and setting the brake. The end of the hook in the exhibit is, as disclosed by the

evidence, bent inwardly toward the connecting rod, so as to leave sufficient room for the end link of the chain to enter. The opening of this hook is so narrow that, when removing the chain therefrom, it will withstand a pressure of from twenty to fifty pounds. It is, therefore, not at all impossible or improbable that, prior to the time plaintiff turned the wheel of the brake to take up the slack in the chain, the connecting link of the chain had whipped over the hook and remained hanging in the mouth or opening of the hook until plaintiff applied his full strength on the wheel in order to stop the car; that when the link or chain suddenly pulled through the opening and disconnected from the rod, causing the wheel to turn freely. A number of witnesses testified that, at times, a sudden jerk of the car in switching caused the chain, on the type of brake here in question, to unhook.

A number of defendant's witnesses testified that they inspected the car, within thirty or forty minutes after the accident, and found the chain properly connected and the brake set. It would require less than two minutes to hook up the chain and set the brake. Since there was substantial evidence in the record, by a number of witnesses, that the chain was hanging disconnected from the connecting rod, it was a question for the jury to determine, under the evidence, whether or not the chain pulled loose from the hook.

■ It was the absolute duty of defendant, under the Safety Appliance Act, to furnish a safe, efficient brake, free from defects. The question of negligence and reasonable care does not enter into the case. [Sallee v. St. L.-S. F. Ry. Co., 321 Mo. 798, 12 S. W. (2d) 476; Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 521, 69 L. Ed. 419.]

Appellant concedes this to be the rule, but contends that, since the car in question was a Santa Fe or foreign car, defendant was required to make only a reasonable inspection to discover defects; that it devolved upon plaintiff to show negligence in this regard before he would be entitled to recover for alleged injuries, received by reason of defective appliances. Defendant cites one case in support of this rule. [Rupert v. C. M. & St. P. Ry., 232 N. W. 550.] The Rupert case is not an authority supporting appellant's contention, since the suit in that case was not brought under the Safety Appliance Provision of the Federal statute. To the same effect is the case of New Orleans Ry. v. Harris, 247 U. S. 367. The provisions of the act (45 U. S. C. A. sec. 11), applicable to this case, read as follows:

"11. *Safety appliances required for each car; when hand brakes may be omitted.* It shall be unlawful for any common carrier subject to the provisions of this chapter to *haul, or permit to be hauled or used* on its line any car subject to the provisions of this chapter not equipped with appliances herein provided for, to-wit: all cars must

be equipped with . . . efficient hand brakes . . ." (Italics ours.)

The wording of the act itself plainly includes foreign cars hauled or used by any railroad company. The Federal statute was expressly held to include foreign cars in the case of Tyon v. Wabash Ry. Co., 207 Mo. App. l. c. 338 and 339. [See, also, 2 Roberts, Fed. Liabilities of Carriers, sec. 666.] The point is, therefore, ruled against appellant.

■ Appellant next urges that the trial court erred in excluding the testimony of witness Herndon, relative to plaintiff being intoxicated on the day he received his injuries. This contention is without merit. The record reveals the following:

"Q. Well, did you see Mr. Radler that afternoon? A. Yes, sir.

"Q. Before his injury? A. Yes, sir.

"Q. Tell the jury what you observed of him and what report if any, you made about it? A. Well, in my opinion he was under the influence of, I would judge, intoxicating liquor.

"MR. MADDEN: I object to that if Your Honor please, I object to that statement and move that it be stricken out as a conclusion and not a statement of fact.

"THE COURT: Objection sustained. . . .

"Q. (BY MR. CONRAD): What did you observe of him that afternoon? A. Sir?

"Q. What did you observe on the part of Mr. Radler that afternoon? A. Well, his step was irregular and he seemed to stagger about at times. .

"Q. Did you make any report of that—you needn't tell what you said—but did you make a report of that to any official of the Frisco at that time?

"MR. MADDEN: I object to that as a hearsay matter; self serving, and not competent.

"THE COURT: Sustained."

The answer of the witness, that in his opinion plaintiff was intoxicated, was not stricken out, by the ruling of the court, sustaining the objection of respondent, but remained in the record. [Boyd v. Kansas City, 291 Mo. 622, 237 S. W. l. c. 1008 (12).] The record fails to disclose that the witness had a sufficient opportunity to observe plaintiff and form an opinion of his condition with reference to intoxication. Therefore, it would not have been an abuse of discretion, on the part of the trial court, to have rejected the opinion of the witness. [22 C. J. 526.] The witness was permitted, without objection, to state what he had observed on the part of plaintiff. We have in the record the opinion of the witness and also an account of his observation of the actions of plaintiff. The court properly sustained the objection to the question with reference to the report witness

made, at the time, to a third person. The testimony of a witness cannot be corroborated by proof of statements made out of court. [10 R. C. L. 960.]

What we have said disposes of all questions, raised by appellant, except the complaint that the verdict of twenty-five thousand dollars ($25,000) is grossly excessive.

. Respondent, at the time of the trial, was forty-nine years old. He had been employed, by appellant, for a period of twenty-three years. The record discloses that he worked almost continuously, being absent from his work only a few days per year. His average earnings were about twenty-one hundred dollars ($2100) per annum. Respondent's major injury was the loss of his right arm, which incapacitated him from following his usual and only occupation. Other injuries, complained of and supported by evidence, are not of a serious nature. Dr. Edward Geraughty, plaintiff's witness, described the injury to plaintiff's head as follows:

"Q. What do you mean by that? A. Well, we treated the symptoms. He had his right arm off, and had cerebral concussion.

"Q. What do you mean by cerebral concussion? A. Blow to the brain; blow to the skull; traumatism to the skull, or brain. That was evidenced—the known symptoms, which is in the pupillary reflex on light and disturbance in the reflexes at times. Sometimes they would be quite slow; the knee reflexes; and other times they would be more rapid and jerky. This indicated what we call in medical law cerebral concussion. It is exhaustion, with headaches.

"MR. CONRAD: Just a minute. You are giving symptoms now?

"MR. MADDEN: Yes.

"THE WITNESS: Yes.

"MR. CONRAD: All right.

"A (continuing) Exhausted, with headaches in connection; pains in his head; dizzy sensations; vertigo.

"Q. Vertigo, that is kind of a swimming, dancing sensation? A. Yes; at different times he had complained of having attacks of what he calls slight attacks. I only saw one of these in my office. He had—"

Dr. McVay, employed by appellant, amputated plaintiff's arm and treated him until the arm, at the point of amputation, healed. With reference to plaintiff's injury to his head Dr. McVay testified as follows:

"Q. Well, was the operation as such a successful operation, Doctor? A. We would deem it so, yes, sir.

"Q. Now, Doctor, something has been said by you there was some kind of injury about the hair line. I wish you would explain to the jury just what you found. What the nature of that injury was. A. As I recall, it was a small laceration or cut, not down to the bone

but just through the skin; no evidence of any further injury that just, practically speaking, a break in the skin. Of course, I don't recall of it being sufficient to cause us to take any stitches there.

"Q. You didn't even take any stitches? A. Not that I recall.

"Q. Doctor, did that wound there on the head give you any trouble at all? A. Never any complaint from it and no evidence of it from examination.

"Q. Did Radler make any complaint to you about it at all? A. Not that I recall, no, sir.

"Q. Did you ever hear anything about any symptoms of dizziness while treating him at all? A. Not while he was under my care.

"Q. Did you see anything there which would account for any such condition as that? A. No, sir.

"Q. You did not? A. No, sir.

"Q. You had the case under your observation from the very start until probably a month had gone by? A. Yes, sir."

The amputating of plaintiff's arm was very successful. He experienced no complications of any kind. Plaintiff was removed from the hospital and treated for a period of five weeks.

Respondent contends the verdict is not excessive and cites many cases in support thereof. [Woods v. St. L. Merchants' Bridge Terminal Ry. Co., 8 S. W. (2d) 922; Pulliam v. Wheelock, 319 Mo. 139, 3 S. W. (2d) 374; Frese v. Wells, 40 S. W. (2d) 652; Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693, and others.] An examination of these cases discloses that in every case the injuries were of a more serious nature, when compared with the amount of the verdict, than the injury plaintiff received.

Appellant has also cited many cases in support of its contention that the verdict is excessive. [Busch v. Louisville & N. R. Co., 322 Mo. 469, 17 S. W. (2d) 337; Vaughan v. St. Louis Merchants' Bridge Terminal Ry. Co., 322 Mo. 980, 18 S. W. (2d) 62; Bante v. Wells, 34 S. W. (2d) 980, and others.]

Taking into consideration the evidence with reference to plaintiff's injuries, and giving it due credit, keeping in mind, however, the proneness on part of plaintiffs to somewhat exaggerate their injuries in suits of this nature, and also applying a standard of uniformity to the amounts of verdicts in cases of this kind, as disclosed by the cases cited above, we deem the verdict excessive by ten thousand dollars ($10,000). If, therefore, plaintiff will, within ten days, enter a *remittitur* for that amount, the judgment of the trial court will be affirmed in the sum of fifteen thousand dollars ($15,000), as of the date of the judgment in the circuit court. Otherwise it will be reversed and remanded. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All of the judges concur.