GEORGE G. ASHLEY, Respondent, v. PAUL G. WILLIAMS, Administrator of the Estate of GEORGE W. MINNICK, Deceased, Appellant, No. 44633—281 S. W. (2d) 875.

Division Two, September 12, 1955.

*Thompson & Thompson* for appellant.

*Russell D. Farris, Eugene A. Farris* and *Wilson D. Hill* for respondent.

[877]   STORCKMAN, J.—The plaintiff, George G. Ashley, filed his claim in probate court against the decedent estate of his father-in-law, George W. Minnick, to recover the reasonable value of services rendered to Mr. Minnick during the last years of his life, a period of

about eight years. The claim was certified to circuit court where a jury returned a verdict for $12,000 in favor of plaintiff. From the judgment rendered thereon the defendant, Paul G. Williams, administrator of the estate of George W. Minnick, deceased, has taken this appeal.

George W. Minnick had been a widower for many years. He had four living children, two sons and two daughters. He owned a 47 acre farm in Clay County just across the Ray County line, on which he had lived in recent years. A son, William Orville Minnick, and his wife lived on the farm with him for a period of about three and a half years. Orville's wife wanted to go back to the Ozarks where she had a farm, so Orville and she moved away in March, 1943. Thereafter the farm and its improvements were rented for cash or shares of the crops. Mr. Minnick continued to live on the farm alone, cooking his own meals, until October, 1945. One daughter, Allie, married to the plaintiff, George G. Ashley, lived with her husband and their family on a farm about five and one-half miles southwest of Richmond in Ray County. In 1945 Mr. Minnick was 81 years of age, and it had become apparent that he was no longer able to stay by himself. During the latter part of September Mr. Minnick talked with his daughter, Allie Ashley, about coming to live in the Ashley home. About a week later Mr. Minnick talked to George Ashley in Allie's presence about the same matter. Shortly thereafter, in early October 1945, he moved into the Ashley home where he lived until the time of his death on July 9, 1953. Although it is not clear as to the kind of her employment, it appears that while Mr. Minnick lived in the Ashley home Allie Ashley "was out working, making a living" and she "was bringing in the food to eat." Further details of the evidence will be referred to in the course of the opinion.

Errors assigned are: (a) In permitting the witness, Allie Ashley, to testify to the terms of the contract with the deceased since defendant contended she was a party to the contract; (b) In not directing a verdict for the defendant for the reason that there is no substantial evidence that a contract existed between George Minnick and his son-in-law, George Ashley, to care for him for pay; (c) In permitting a practical nurse to testify in response to a hypothetical question with respect to the value of the services alleged to have been rendered by the plaintiff; (d) In giving and reading to the jury plaintiff's instruction No. 1, because it permitted recovery for the furnishing of food, washing of clothes and furnishing a home to defendant's decedent when there was no evidence of the value of such services, and further that it failed to limit the recovery to the services of nursing and caring for defendant's decedent, and that (e) The verdict of $12,000 is so grossly excessive as to shock the conscience of the court and to show that the discretion of the jury has been arbitrarily exercised and abused.

■ We will first consider the question of whether there is substantial evidence that there was a contract or mutual understanding that the plaintiff would be compensated for the services rendered by him to his father-in-law, George W. Minnick. For the reasons later referred to, all the evidence in this record on appeal may be considered in determining this issue. In reviewing this question, the evidence most favorable to the plaintiff must be accepted [878] as true, the plaintiff must be given the benefit of all reasonable inferences arising from such evidence, and all evidence unfavorable to the plaintiff must be disregarded. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Sibert v. Boger, Mo., 260 S.W.2d 569. For numerous other cases, see Mo. Digest, Appeal and Error, Key No. 927[5], and Trial, Key No. 156[3].

The controlling evidence is that somewhere between the middle and the latter part of September, 1945, Allie Ashley talked to her father about his staying at the Ashley home, and he wanted to talk to the plaintiff, George Ashley, about it. Allie Ashley testified that "we went back the following Sunday, and he [Mr. Minnick] talked to George, and he made a statement to George also." Her father made an agreement with her and he also made a second agreement with her husband George. She heard the conversation between her father and her husband and her father told George that "if it was all right with him, that he would come there and stay with, with him, and that he wanted him [George] to have what he had at his death," and "that he [George] was to care for him" [Mr. Minnick]. Thereafter her father moved to the Ashley home where he stayed and was cared for by the plaintiff except for an interval that Mr. Minnick was in the hospital and at a nursing home when the plaintiff became ill. On cross examination, witness Allie Ashley testified that she did not present an account to her father because "that agreement was between my husband and my father," and on redirect examination the witness testified without objection that her husband did not present an account or bill to her father during his lifetime because the agreement had been made "between my husband and my father" before her father came to live with them, and that "there had been a prior agreement."

Walter Hicks testified that Mr. Minnick had told him that George and Allie were "awful good to me" and that "I made my will and I left everything to George and Allie." Mrs. Walter Hicks testified that Mr. Minnick told her that he had done better than making a will, that he had made deeds out to George and Allie. Jake Spor testified that he had tried to buy the Minnick place and Mr. Minnick told him that he would not sell it because he intended for George Ashley and Allie to have it at his death. Silas M. Smith, another neighbor and friend, testified that Mr. Minnick had told him that he liked living with George and Allie and that he was well treated, and

that when he was gone he wanted George and Allie to have what he had for taking care of him.

In view of this testimony and the other facts and circumstances in evidence, we hold that there was substantial evidence of an agreement or mutual understanding between the plaintiff and George W. Minnick that the plaintiff should be compensated for the services rendered to George W. Minnick, thereby rebutting the presumption arising out of the family relationship that the services were performed gratuitously. In the case of Nibler v. Coltrane, Mo., 275 S.W.2d 270, the agreement sued on was that the claimant, a niece, was to receive whatever property the survivor of two aunts should have at her death if the niece lived with them, remained unmarried, and performed certain services. The proof was held sufficient to overcome the presumption that the services in question were gratuitously rendered and to permit the plaintiff niece to recover the reasonable value of her services. See also Vosburg v. Smith, Mo. App., 272 S.W.2d 297; In Re Stein's Estate, Mo.App., 177 S.W.2d 678; and Joseph v. Joseph, Mo.App., 164 S.W.2d 145. In support of his contention that there was no substantial evidence of an agreement to pay for the services rendered, the defendant cites the cases of Nelson v. Poorman's Estate, Mo.App., 215 S.W. 753; Trantham v. Gullic, Mo.App., 201 S.W.2d 522; Vosburg v. Smith, supra; and Roller v. Montgomery's Estate, Mo. App., 80 S.W.2d 246. In the Vosburg case the evidence was sufficient and a recovery permitted. In the other cases no agreement was proved nor were there facts or circumstances from which a jury could infer an agreement.

[879] The defendant further contends that the evidence on the agreement to pay is so contradictory that "it is equivalent of insufficient evidence," citing cases typical of which is Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, wherein it is stated (59 S.W. 2d l.c. 647): "Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no case is made, and the jury should not be permitted to speculate or guess which statement of the witness should be accepted. * * *" The testimony of Allie Ashley on the issue of whether there was an understanding or agreement that the plaintiff would be paid for the services he rendered to Mr. Minnick was not contradictory or conflicting. She consistently testified that her father did agree to pay for the services to be rendered. The uncertainty was whether plaintiff's compensation was to be a joint or a several interest in the property of the deceased. The defendant's theory and contention below was that there was only one contract and that the interest of the plaintiff and his wife under the contract

292

was joint. This, however, was urged only as a reason for disqualification of the wife as a witness and not as grounds for dismissal because of the nonjoinder of the wife as a necessary party or other appropriate relief. Even if it be assumed that George Minnick stated that he wanted George and Allie to have whatever he had left for taking care of him, this did not necessarily mean or imply that they must have it jointly. They could take whatever he had left in severalty as well as jointly in the proportion that the services of each bore to the total services rendered.

Although the agreement was informal in terms, the purpose and intent is clear and we are convinced that the evidence was sufficient to carry the issue to the jury. The credibility of the witnesses and the weight to be given to their testimony were questions for the jury. There is at least an implied recognition of this fact in defendant's brief on page 37, wherein it is stated: "Under her [Allie Ashley's] testimony, if there was any contract at all, it had to be joint. Certainly not several, even though she testified to that effect."

■ Defendant's counsel interrupted the direct examination of the plaintiff's wife, Allie Ashley, to ask some "preliminary questions." This was before any objection had been made to her competency. During this examination, conducted in the presence of the jury, defendant's counsel interrogated the witness exhaustively about the making of the agreement for the care and maintenance of her father. Counsel asked about the conversations the witness had had with her father and about the later talk between the plaintiff and witness's father in her presence. Counsel undertook to prove by her own testimony that the contract Mr. Minnick made was with her and her husband jointly. When he finished his examination, defendant's counsel objected "to her testifying to any contract between them" because she was a joint party to the contract. The trial judge overruled the objection, and we think rightly so.

It is the function of the trial judge to determine all matters of fact upon which the admissibility of evidence depends, and this includes the competency or capacity of a witness to testify. 2 Wigmore on Evidence, 3rd Ed., § 487; Clark v. McAtee, 227 Mo. 152, 127 S. W. 37, 49. The evidence was sufficient to justify a finding that the witness was competent because the agreement sued on was a several one between the plaintiff and Mr. Minnick. See Snider v. McAtee, Mo., 178 S.W. 484, 488; Martin v. Abernathy, 220 Mo.App. 76, 278 S.W. 1050; and Mollett v. Beckman, Mo. App., 78 S.W.2d 886. We cannot say that the trial court abused its discretion in holding the witness competent to testify.

■ Even if the plaintiff's wife had been incompetent under the "Dead Man's" statute, [880] § 491.010 RSMo 1949, the defendant waived his right to exclude her testimony by his interrogation of her during direct examination without objection upon the very subject

matter about which he claimed she was incompetent to testify. In Ladd v. Williams, 104 Mo.App. 390, 79 S.W. 511, 512, the court in reviewing a similar situation stated: "If it be conceded that Ladd was not a competent witness, the defendant waived the incompetency by not making a timely objection to his testimony. The objection made was not until the defendant had drawn from the witness, on his cross-examination, evidence that she was not expecting, and that was prejudicial to her interest. A party cannot take the chance of waiving the incompetency of a witness, in the expectation of drawing from him favorable testimony for himself, and, when the experiment proves disastrous, withdraw his waiver, and have the evidence he himself has drawn out stricken out of the record. * * *"

In the case of State v. Emrich, Mo., 250 S.W.2d 718[4], it was held that the incompetency of the witness was waived by failure to object to the witness's testimony prior to the time the testimony was given. The incompetency of a witness to testify where the other party to the contract or transaction in issue and on trial is dead, is waived by the taking of the witness's deposition or the serving of interrogatories. Hodge v. St. Louis Union Trust Co., Mo., 261 S.W. 67; Lehr v. Moll, Mo., 247 S.W.2d 686. By his "preliminary questions" during the direct examination of plaintiff's wife, defendant waived the witness's incompetency as effectively as if he had taken her deposition.

On several occasions the defendant objected after the witness had answered the question. When those objections were sustained, however, no motions to strike these answers were made. The sustaining of an objection to a question does not have the effect of striking out the answer in the absence of a motion to strike the testimony given. Russell v. Union Electric Co., 238 Mo.App. 1074, 191 S.W.2d 278; Steeley v. Kurn, 348 Mo. 1142, 157 S.W.2d 212, 213; Radler v. St. Louis-San Francisco Ry. Co., 330 Mo. 968, 51 S.W.2d 1011, 1013. Even though the answers of the witness were conclusions, the testimony remains in the case where there is no motion to strike and the credibility of such testimony is for the jury. Goodman v. Allen Cab Co., 360 Mo. 1094, 232 S.W.2d 535; Vosburg v. Smith, Mo. App., 272 S.W.2d 297.

Geneva Coffman, a practical nurse of five or six years' experience, was permitted to answer, over defendant's objection, a hypothetical question as to the reasonable value of services of the kind rendered to Mr. Minnick. The witness testified that she had had experience at one time or another with all of the items mentioned in the question, and that the fair and reasonable charge per day for performing such services would be $10.00 for an eight hour working day. The defendant charges that the court erred in permitting the witness to answer, because the witness was not qualified by experience or knowledge. As we have previously pointed out, the matter of a

294

witness's competency or qualifications is peculiarly within the discretion of the trial court. We will not interfere with the ruling of the court unless an abuse of discretion appears. Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001, 1008. The authorities cited by the defendant tend to support the admission of the witness's testimony rather than its rejection. See Bosard v. Powell, 79 Mo.App. 184; Elstroth v. Karrenbrock, Mo.App., 285 S. W. 525; and Nesbit v. Shisler, 175 Mo.App. 565, 158 S. W. 419. We find no error in permitting the witness to answer.

The defendant further complains that instruction No. 1 was erroneous in that it permitted respondent to recover for the services of furnishing deceased with food and washing his clothes and in furnishing him with a home when there was no evidence offered by the respondent as to the value of such services, and that the instruction failed to limit the recovery to the services [881] of nursing and caring for deceased as that was the only service upon which there was any evidence of value. This instruction follows substantially instruction No. 2 given and considered in the case of Love v. Richardson, Mo. App., 61 S.W.2d 220, 223. Opinion evidence of the reasonable value of the services involved was given by plaintiff's witness Geneva Coffman and defendant's witness Marvin Penny, operator of a nursing home. Moreover, many of the services were of a sort that their reasonable value is within the common knowledge of the court and jury.

Where the reasonable value of particular services is a matter of common knowledge, proof of the reasonable value is not essential to a recovery in quantum meruit. As stated in McDonough v. Freund, 323 Mo. 346, 19 S.W.2d 285, 287, "The members of a jury may be presumed to know the value of the services of a nurse or common laborer." In Re Hartle's Estate (Wright v. Hartle), Mo. App., 236 S.W.2d 40, the mother of a child and her present husband filed suit against the estate of her former husband to recover for the support of the child during the period of about nine years that the child lived with the plaintiffs. The court held (l.c.42) : "There was no necessity for the introduction of opinion evidence upon the question of value, and the court should have reached its own conclusion from the facts before it without regard to any lack of probative force in Mrs. Kilhafner's testimony." In the case of Wise v. Rubenstein, Mo.App., 24 S.W.2d 203, it was held that the value of domestic services need not be proved in that the judge as well as the jury is presumed to know the value of such services. There is no merit in the assignment of error.

Defendant urges that the verdict for $12,000 is "so grossly excessive as to shock the conscience of the court and as to show the discretion of the jury has been arbitrarily exercised and abused." The verdict of the jury was unanimous. The trial court had an opportunity to review the alleged excessiveness of the verdict and did not

see fit to grant a new trial for this or any other reason or to require a remittitur.

Mr. Minnick was 81 years of age when he moved to the plaintiff's home in October 1945. He was given a room for his private use and he continued to occupy it until the time of his death over seven years later. He was tottery and did not do physical labor but was in moderately good health for a man of his age. The plaintiff took Mr. Minnick places and attended to business matters for him. He furnished a home for Mr. Minnick and performed all necessary personal services, including cutting his hair. Mr. Minnick's physical and mental health steadily deteriorated and from January 1952 on, he could not dress himself and became bedfast. From that time on he required practically continuous care, attention and nursing services. For two years before Mr. Minnick became bedfast he was not able to stay by himself and was never left alone. After he became bedfast Mr. Minnick's mental and physical condition was such that he had to be cared for like a baby. He was a large man, weighing close to 200 pounds when he became ill. He lost control of his kidneys and bowels and had to be kept in diapers. His clothing and bedclothing had to be changed frequently, and there were daily washings. He had to be bathed and fed and given his medicine. His condition was such that he could not be left alone even at nighttime—someone had to be with him constantly. The plaintiff took care of and attended to Mr. Minnick, bathing and feeding him, changing and washing his soiled clothing and bedclothing. There is ample evidence that the plaintiff rendered many services in providing a home for Mr. Minnick and attending to his business affairs prior to the time that he became totally disabled. After that time, the services required were extremely burdensome and disagreeable. It is apparent from the record that Mr. Minnick was capably cared for and the services were rendered with kindness and devotion.

Geneva Coffman testified the reasonable value of the services of a practical nurse [882] in such a case was $10.00 per day, which did not include washing and some other services that Mr. Minnick received. Defendant's witness, Marvin Penny, operator of the Penny Rest Home which had nine patients served by one practical nurse, testified to a reasonable value of $150.00 per month per person. The services about which Mr. Penny was asked included "furnishing a home, providing provisions and other necessities of life." As we have heretofore indicated, the value of many of the services are within the common knowledge of jurors. We have examined the cases cited by the parties, and under the facts and circumstances in evidence, we are not persuaded that the amount of the verdict is excessive.

Finding no error in the record, the judgment should be affirmed, and it is so ordered. All concur.