Walter E. ALLEN, Administrator of the Estate of Esther Lucille Wilson, Deceased, Respondent,

v.

Arthur Lewis HAYEN, Appellant.

No. 46717.

Supreme Court of Missouri,

Division No. 1.

Jan. 12, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 9, 1959.

Errol Joyce, Brookfield, Ronald L. Somerville, Lloyd A. Cleaveland, Chillicothe, for appellant.

Bollow, Crist & Oswald, Thomas R. Oswald, Shelbina, James J. Wheeler, Keytesville, for respondent.

HOLLINGSWORTH, Judge.

As he sat, apparently in a stupor, upon U. S. Highway 36, on the night of October 21, 1954, Leone Wilson, hereinafter referred to as "decedent", was instantly killed when struck by a westbound automobile owned and driven by defendant. Decedent was survived by his widow, Esther Lucille, and three minor children. On April 14, 1955, Mrs. Wilson instituted this action in the Circuit Court of Linn County against defendant to recover the sum of $15,000, under the wrongful death statute. Section 537.070 et seq. RSMo 1949, V.A.M.S. Thereafter, the case was sent on change of venue to the Circuit Court of Chariton County. Mrs. Wilson died on April 15, 1957, and the action was revived in the name of her duly appointed and qualified administrator, Walter E. Allen, as plaintiff. Upon trial to a jury, the cause, at the election of plaintiff, was submitted on the sole ground of defendant's humanitarian negligence in failing to swerve his automobile and thereby avoid striking decedent after defendant, in the exercise of the highest degree of care, should have seen decedent in a position of imminent peril. The trial resulted in a ten-juror verdict and judgment for plaintiff in the sum of $12,000. Following the overruling of defendant's motion to set aside the verdict and judgment and for entry of judgment in favor of defendant in accord with his motion for a directed verdict filed at the close of all of the evidence or, in the alternative, for a new trial, defendant appealed.

In this court, defendant assigns error: (1) in the refusal of the trial court to sustain his aforesaid after-trial motion to set aside the verdict and for entry of judgment for defendant, and (2) in the giving of certain instructions in behalf of plaintiff, the refusal to admit certain testimony proffered by defendant, and the re-

fusal to set aside the verdict because it was (a) the result of passion and prejudice and (b) excessive. The view we take of the case makes it unnecessary to consider any assignment other than the first, which, in essence, is that no submissible case of humanitarian negligence was made against defendant. In considering that question, we review the evidence from the standpoint favorable to plaintiff, giving him the benefit of such evidence of defendant as is favorable to plaintiff, all favorable inferences from all of the evidence, and disregard all of defendant's evidence that is unfavorable. Catanzaro **v.** McKay, Mo., 277 S.W.2d 566, 568.

The collision occurred near the division line between Macon and Linn Counties. At that point and east and west thereof, Highway 36 is straight and extends in an east-west direction. It is paved with concrete, 24 feet in width, with two driving lanes, each 12 feet in width, with a black line marking the division between them.

The north shoulder along that portion of the highway is 11 to 12 feet in width. North of the north shoulder there is a business establishment, referred to in the evidence as "Cupp's Place", where are sold "gas, groceries, soft drinks and hard liquor." A semi-circular driveway, paved with gravel or crushed rock, extends from the highway to the front of Cupp's Place, with entrances at the east and west ends connecting with the highway. The distance between the centers of these entrances is 170 feet. The east entrance of the driveway is 79 feet in width and narrows at its "throat", about 20 feet north of the pavement, to a width of 39 feet. The gravel on the east entrance was hard and packed, as though it might have had oil on it at some time.

Attached hereto is a photograph, defendant's exhibit 3, showing the highway, the driveway and Cupp's Place. The camera is pointed northwestwardly from a point south of the highway and east of Cupp's.

Defendant's Exhibit 3

The highway, as it extends along the area shown in the picture, and east and west of the area shown, is constructed through a series of cuts made in hills and fills made in ravines. From a point beginning about one-eighth mile east of Cupp's Place, it runs gradually downgrade westward along and beyond Cupp's Place to a creek, the total length of the slope being 1.5 miles. In front of Cupp's Place it is constructed on filled ground. Immediately adjacent to the north shoulder and the east edge of the east entrance of the driveway into Cupp's Place there is a deep ditch, described as being 14 feet in depth and 40 feet wide. Adjacent to the north shoulder, in the island formed by the semicircular driveway, there is a ditch five or more feet in depth and 20 to 25 feet in width. Adjacent to the north shoulder and the west edge of the west driveway there is a long ditch about 35 feet in depth. Drainage culverts are constructed under the east and west entrances of the driveway.

The night of the collision in question was dark and cloudy. The pavement was dry but, due to rain which had fallen prior to that day, the north shoulder was muddy and there were puddles of water in the east entranceway into Cupp's. There is no evidence that lights, if any, from Cupp's Place illuminated the highway or the entrances into Cupp's Place. One of plaintiff's witnesses testified that the north shoulder was not muddy enough for one to mire down, but it was sufficient to muddy one's shoes. Another said it was "quite soft, muddy, puddles of water in the west driveway, puddles of water everywhere, each one of us ruined a good pair of shoes." Another said the soil was "gummy" enough to stick to one's shoes, but that he saw no vehicle "stuck" on the shoulder there that night. Another said it was "soft and muddy" and there were puddles. Another said it was "not what we call in this country muddy, it would stick to your shoes."

The collision occurred about 11 o'clock, p. m. Shortly prior to that time, a group of social welfare workers, riding in a westbound automobile driven by one of their number, Paul White, approached the point where the collision thereafter occurred. White, aged 30 years, testified: As they approached Cupp's Place, they were traveling at a speed of 55 to 60 miles per hour with their headlights on "bright". There was a westbound car about one-fourth to one-half mile ahead of them. They saw that car swerve to the center of the highway at the east entrance to Cupp's Place and then proceed onward. Thereupon, White slowed his car a little and "watched". There was no oncoming traffic or lights to obscure his vision. At a distance of 60 to 80 feet ahead of him, at the point where the car preceding his car had swerved, he saw an object on the pavement, which he at first thought was a garbage can. He swerved to the left and passed around it. A discussion between the occupants of White's car then ensued. They concluded that the object was a man. After White's car proceeded onward for a short distance, an eastbound car approached, followed in a short interval by two eastbound tractor-trailer trucks. White turned his car around and followed the three vehicles "to see if we could get the man off the road." The trucks were about 150 feet apart and traveling at 45 to 50 miles per hour and White's car was about 150 feet to the rear of the rear truck. White then saw the headlights of an oncoming westbound (defendant's) car approaching the object (decedent). When White's car was approximately 150 feet from decedent, he saw defendant's car strike decedent. The leading eastbound truck had passed defendant's westbound car and the second truck was passing or had just passed defendant's car when the impact occurred. There was nothing unusual about the movement of defendant's car. When struck by defendant's car, decedent, facing west, was sitting in the center of the north traffic lane of the highway at a point south of the center of the east driveway into Cupp's Place. White drove his car into the east driveway and around to the west entrance. There were puddles of

water in the east driveway. Decedent's body lay approximately at the west entrance, still on the highway, where it had been carried by the impact.

In general, the other occupants of the White car corroborated the testimony of White. One of them testified that decedent was sitting in the center of the highway when they first saw him as they drove westward and was in the same position when they saw him struck as they returned eastward. Another said that when they first saw decedent he was sitting on the north shoulder, not on the pavement, but that as they returned and before defendant's car struck him, decedent, facing west, was sitting in the middle of the north lane of the highway. One of them testified that as they returned eastward they were looking for "this object", but could not see where "he" was until they "got up pretty close to him", and that decedent was dressed in blue denim overalls. One of plaintiff's witnesses further testified that the turn from the highway into the east entrance to Cupp's Place was a "square" or "right angle" turn.

Lester Hutton, coroner of Macon County, testified in behalf of plaintiff. He was called between 11 and 12 o'clock on the night of October 21 and drove nine-tenths of a mile to the scene of the collision, where he found the dead body of Leone Wilson. He wore denim overalls and a work shirt. His face was crushed, both arms, both shoulders and both hips were broken and there were bruises and cuts over his entire body. There was a strong odor of alcohol from his body. An ambulance was parked on the north shoulder of the highway a little east of the west entrance. Defendant told the witness that he was meeting a truck or trucks and had dimmed his lights and the truck lights were dimmed and that he "was right on top of the deceased then and could not miss him." Defendant also told witness he was driving approximately 60 miles per hour when he struck deceased. Defendant's car was parked on the north shoulder,

298 feet west of the center of the east driveway into Cupp's Place. Witness did not examine the ditch north of the shoulder and east of the entrance. He did, however, examine the ditch just west of the east entrance. It was "deep enough I don't think you would want to run off in it at sixty miles."

Plaintiff introduced into evidence portions of a deposition theretofore given by defendant, wherein defendant stated: At the time of the collision he was driving a 1954 Star Chief Pontiac from New Cambria to Brookfield. The lights were equipped with an electronic device that automatically dimmed them and they were working, and his brakes were working properly. He was driving approximately 60 miles an hour as he approached the point of the collision. The pavement was dry. He met, first, an oncoming car and then two tractor-trailers. The first car was about one-eighth of a mile ahead of the trucks. The lights on that car and the tractor-trailers were dimmed.

Brice Thompson, aged 45 years, a sergeant in the Kansas City Police Department, after qualifying as an expert with special training and experience as an investigator of accidents, testified that he made certain tests during a dark night on an unlighted street in Kansas City to determine the range of visibility from automobile headlights and the "swerveaway" distances from a bag of straw placed upon the highway after it became visible in the headlights. He then further testified:

"Q. Mr. Thompson, will you tell this jury whether or not you conducted any tests to show how far the beam of a headlight, 1954 Pontiac would illuminate an object? A. Yes, sir, I did.

\*    \*    \*    \*    \*    \*

"Q. Would you please tell the jury what effect, assuming your 1954 Pontiac had the headlights on dim, what adjustment—how far it would extend ahead of the car? A. The left beam

on the headlights is adjusted at twenty-five feet.

"Q. What do you mean? A. When a car is set on a level surface twenty-five feet in front of it, the left beam would be adjusted to throw it straight forward from one to four inches.

"Q. What about its right beam instead of the left? A. Both beams would be depleted.

\* \* \* \* \* \*

"Q. Would you go ahead and give the result of that test? A. Yes, I could see the bag and recognize it as such at 189 feet.

\* \* \* \* \* \*

"Q. Now, Mr. Thompson, would the fact that there was oncoming traffic make any difference to this visibility test just spoke of? A. Yes, sir. There would be some difference made when you do have the headlights approaching on low beam."

Prior to permitting the witness to testify to the results of tests relative to "swerveaway", the trial court, by its rulings, indicated it would permit the witness to state the manner in which he made the tests and thereafter determine the admissibility of the results. During the examination of the witness ostensibly relating to the manner of making his tests, he, however, testified:

"Q. Now, tell the jury what other tests you made? A. I conducted a test on the visibility to swerveaway from an object using a '54 Pontiac, using the bag placed in the center of the lane, I drove this Pontiac at sixty miles per hour to a point where I was clearly able to see the bag—\* \* \*—at that point I applied the brake with enough pressure— \* \* \*—after applying the brake to the extent that I tried, then I would swerve around the bag that was in the highway."

The trial court sustained defendant's objection to that question, but defendant did not move to strike the answer. The witness further testified as follows:

"Q. Mr. Thompson, when you conducted this test, did you have approaching traffic? A. No, I did not have approaching traffic on this test."

And, later, the witness further testified:

"Q. Did you conduct any test in which you had approaching traffic? A. Yes, sir.

"Q. Will you explain that test? A. I made four tests with this same automobile in order to determine the point in which I could start evasive action.

"Q. What do you mean by evasive action? A. At that point I was able to operate my automobile that I might evade an danger, and I approached this bag at sixty miles an hour, I had another car which was being driven to the bag, I applied the brake with enough pressure so it would leave a skid mark on a highway, afterwards I was able to mark the distance from an automobile to take its evasive action after it had seen its danger at sixty miles per hour.

"Q. Mr. Thompson, is there any mathematical formula, or have you any training which would give you any information in what distance you could turn or swerve a car at any given speed with safety to himself? (An objection was sustained.)

"Q. Mr. Thompson, you say you made a test in which you had approaching traffic? A. Yes, sir.

"Q. Will you explain the condition under which it was made? A. In that particular test it was conducted on a twenty foot roadway with no street light available.

"Q. This was conducted on High Street at Kansas City, Missouri? A. Yes, which runs along the river, in this particular test I used a bag made of burlap filled with straw, which was

three feet high and two feet wide and was placed in the center of the westbound lane, I was operating a '54 Pontiac at sixty miles per hour, another vehicle was being driven with the lights on low beam.

"By Mr. Joyce—What kind of a vehicle? A. A Ford, it was being driven in the east boundary of the traffic, it was approaching the bag from the west at the time I arrived at this bag when I was able to recognize the vehicle that was coming toward me was approximately a hundred feet to the west of the bag my headlights on the Pontiac was also on city driving beam, when I was able to see the bag at that time I applied the brake to leave skid mark, after that I continued on down the highway and struck the bag, after I came to a stop I returned to where the bag was. (Defendant's objection was overruled.) And that was done four times. I operated this vehicle four times under this condition."

█ Following a long colloquy in which a series of hypothetical questions were propounded and a long series of objections were made, the court sustained defendant's objection to questions propounded to the witness as to the distance in which he could, with safety to himself, swerve a car at a given speed. The grounds upon which the objections were sustained were that the conditions under which the tests were made were not shown to be similar to the conditions under which the collision occurred, as the record clearly shows they were not. The court, however, did not strike the answers and plaintiff says that the aforesaid answers are in the record for consideration to the extent of their worth, citing Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875, 880. Without deciding the competency of said testimony, we shall give it consideration to the extent of its evidentiary value, if any.

Defendant testified: His eyesight is normal. As he approached the point of the collision there was a car, two tractor-trailers and another car approaching from the west, all with their lights on low beam. These lights blinded him. After passing the first truck and after he saw the cab on the second truck at which time the lights of the rear car shone into his eyes, he saw an object about 15 or 20 feet in front of him in the center of the westbound lane, which the front end of his car struck as he was passing the rear end of the second truck. He did not have time to apply his brake. He was then driving approximately 60 miles an hour. After he struck this object, his car started "to rock". He released his brake, which he had set as or after he struck decedent, then gradually applied it and brought his car to a stop on the north shoulder. He thought the object he had struck was a "critter" lying in the road. He walked back to the scene and met one of the "welfare men", who told him he had struck a man, which unnerved him.

On cross-examination, defendant testified:

"Q. Of course, your deposition was taken on the 19th day of October, 1955, was it not, is that right? A. I don't remember the exact date.

"Q. On page 32, line 22, was this question asked you, 'Q. Could you tell me whether or not these approaching vehicles their lights illuminated your lane of traffic at all you noticed? A. Any lights will illuminate your lane of traffic. They cut your vision at the same time.' I will ask you if that question was asked and that answer was given? A. Yes, sir."

█ Plaintiff admits that due to oncoming traffic in the south lane of the highway defendant could not have swerved his automobile to his left with safety to himself. The sole and narrow question is, therefore, whether, as a matter of law, the evidence was sufficient to support a finding that defendant, while driving at 60 miles an hour at the time, place and under the surroundings and circumstances shown to ex-

ist and, after he saw or should have seen decedent in a position of imminent peril, he could, in the exercise of the highest degree of care and with reasonable safety to himself, have swerved to the right shoulder and avoided striking decedent. Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482, 484; Johnson v. St. Louis Pub. Service Co., 363 Mo. 380, 251 S.W.2d 70, 75; Cunningham v. Thompson, Mo., 277 S.W.2d 602, 605; 22 Mo.Dig., Negligence, █

█ The negligence charged in this case is specific, not res ipsa loquitur negligence, and the specific negligence charged and submitted must be supported by substantial evidence, direct or circumstantial, and may not be left to mere speculation, guess or conjecture. Vietmeier v. Voss, Mo., 246 S.W.2d 785, 789. Neither is the mere possibility that after defendant became chargeable with notice of decedent's position of imminent peril on the highway, he could have swerved to his right and avoided striking him, sufficient to prove the negligence charged and submitted to the jury. Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, 499; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33; Paydon v. Globus, Mo., 262 S.W.2d 601, 604.

█ When, under the facts and circumstances shown in evidence, and at what distance should defendant, in the exercise of the highest degree of care, have seen decedent in a position of imminent peril? There are three sources of evidence in that respect, to wit: (1) the testimony of plaintiff's witness, White; (2) the testimony of plaintiff's expert witness, Thompson; and (3) the testimony of defendant. White's testimony was that as he drove toward the point of collision, he was *watching* to see what had caused the car preceding him to swerve and, although there were no oncoming lights to blind him, he did not see that "object" until he had driven to within 60 to 80 feet of it. When we consider that testimony in connection with decedent's sitting position on

the highway, his clothing and the darkness of the night, it is meaningful; it is a factual estimate by a disinterested automobilist who witnessed the collision and the circumstances and surroundings under which it occurred. Thompson's testimony was that, by test, he recognized a bag (which presumably he placed upon the highway and therefore knew of its approximate location) from a distance of 189 feet. But, in answer to the very next question, he admitted "there would be some difference made when you do have headlights approaching on low beam." The only evidence in the case was that both the oncoming vehicles and defendant's car were on "low beam", but there was no evidence as to the extent that "difference" reduced the distance in which defendant could have seen decedent. Consequently, the jury was left to pure speculation and surmise, from Thompson's testimony, as to how much the visibility distance of 189 feet (shown by his test) would be reduced by that "difference". Even plaintiff does not argue that the "difference" would be a matter of common knowledge or common experience. Hence, the jury was relegated to the testimony of White that, with no oncoming lights, he *watching,* did not see decedent until he was within 60 to 80 feet from him and defendant's testimony that, with oncoming blinding lights, he did not see decedent until he was within 15 to 20 feet of him. Clearly, there was no substantial evidence (other than defendant's, which, although uncontradicted, we ignore) to establish how far defendant's car was from decedent when defendant, in the exercise of the highest degree of care, under the circumstances and surroundings shown in evidence, should have discovered decedent's position of imminent peril. Without such evidence, there was no foundation laid for determination by the jury as to whether defendant, with reasonable safety to himself, could have swerved to his right and avoided decedent. "If defendant *could not* see plaintiff's position until it was too late for defendant to act in averting the collision, the humanitarian rule did not

seize upon the situation, inasmuch as defendant did not have 'notice' of plaintiff's position of peril in time to thereafter avert 'the impending injury.'" (Emphasis theirs.) Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 551.

But, assuming that the jury should find that at some surmised or conjectured distance less than the 189 feet (as reduced by the unknown "difference" testified to by Thompson), or at a distance of 60 to 80 feet (as testified by White), or at some surmised or conjectured distance greater than 15 to 20 feet (as testified by defendant) defendant should have discovered decedent: Could the jury then reasonably find that within that surmised and conjectured distance defendant, while driving at 60 miles per hour, thereafter, *with reasonable safety to himself,* could have swerved to his right and avoided striking decedent, which necessarily would have taken his automobile at least partly upon the north shoulder? The question, we think, is self-answering. Allowing defendant the classical reaction time of three-fourths second, his car would have traveled a distance of 66 feet before he could have taken any action whatever. Taking the visibility distance most favorable to plaintiff, 189 feet, and deducting from that the unknown "difference" by reason of the headlights of both defendant's car and the approaching vehicles being on "low beam" and further deducting the additional known 66 feet for reaction time, we think no finder of the facts can determine with any degree of certainty the distance at which defendant, with reasonable safety to himself, could have begun to swerve to avoid striking decedent. The common experience of automobile drivers teaches them the indisputable physical fact that the operator of an automobile, who, while driving at 60 miles an hour on a dark night, is suddenly confronted by an object in the path of his travel and, who, by reflex action, swerves on to a "soft", "muddy" highway shoulder, adjacent to which are dangerously deep ditches, to avoid striking that object, unquestionably imperils his own life in no small degree. He may accomplish the feat, but, certainly, in so doing, he places himself in actual peril. In fact, a state highway patrolman, testifying in behalf of plaintiff, stated on cross examination:

"Q. Well, would you have turned a car off the driveway—highway? A. I would say any time you pull a car off the highway at sixty miles an hour wouldn't be too safe.

"Q. And the fact that those deep ditches are there would make a situation there that would make it more dangerous? A. Well, the place on the east would.

"Q. There on the north side of the highway? A. Yes, sir."

And, on re-direct examination, he further testified:

"Q. Could a man traveling sixty miles an hour swerve and pull his right wheels off on this gravel driveway with this object in the center of the north lane of the highway and clear the object? A. He would come clear if he had two wheels off on the shoulder and two on the pavement, he could come clear.

"Q. What if he had two wheels on this gravel driveway? A. He would probably, all depends on what happens from there on.

"Q. He could probably get it off? A. He could probably could get off.

"Q. Do you know? A. Yes, sir, I know because I had an experience that would answer that question.

"Q. Did your experience include a gravel driveway? A. No, sir, it included three inches of mud."

We are convinced that the law of humanitarian negligence did not require defendant, in the exercise of the highest degree of care to avoid injury to decedent after defendant discovered or should have

discovered him in a position of imminent peril, thereafter, to wager his own life against the odds shown to exist in this case by swerving his automobile to any part of the shoulder to avoid the collision. In so concluding, we have considered the testimony of plaintiff's expert witness, Thompson, with reference to the tests he made in swerving around a bag placed upon the highway and find it to be of no evidentiary value whatever because his own testimony fails to show that the tests were made under conditions fairly approximating those existing at the time and place of the collision in question.

We have also examined and carefully considered the cases cited by plaintiff and find none of them present a state of facts analogous to the facts and circumstances found in the instant case. These cases are:

(a) as to the contention that defendant saw or in the exercise of the highest degree of care could have seen decedent in time thereafter to have swerved and avoided striking him, Nelson v. O'Leary, Mo., 291 S.W.2d 142; Pulley v. Scott, 362 Mo. 1217, 247 S.W.2d 767; Brawley v. Esterly, Mo., 267 S.W.2d 655; Williams v. Ricklemann, Mo., 292 S.W.2d 276; Dickens v. Heitzman, Mo.App., 141 S.W.2d 183; and

(b) as to the contention that defendant, with reasonable safety to himself and others, could have swerved and avoided striking decedent: Pulley v. Scott, supra; Nelson v. O'Leary, supra; Catanzaro v. McKay, Mo., 277 S.W.2d 566; Perry v. Dever, Mo., 303 S.W.2d 1; Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935.

We hold that defendant's motion to set aside the verdict and judgment and for entry of judgment in his favor was erroneously ruled.

The judgment is reversed.

All concur.

On Motion for Rehearing or to Transfer to the Court en Banc.

PER CURIAM.

■ In his motion for rehearing, plaintiff insists that the court erred in interpreting witness Thompson's testimony that with "headlights approaching on low beam" there would be "some difference" in the result of the "visibility test" made by him to mean that the distance in which defendant could have seen plaintiff would be *reduced*. Plaintiff says it is equally reasonable to infer that said answer meant that the distance would be *increased*. A careful reading of the answer in context with the remainder of the witness' testimony leaves us convinced that we did not err in our interpretation of its meaning. But assuming that the meaning of the answer could not with reasonable certainty be so interpreted, then, for the same reason, it must follow that it could not be interpreted to mean that the distance would be increased. In that case, the most that could be made of its meaning would be that there was "some difference" with complete uncertainty as to whether such "difference" amounted to a reduction or an increase of visibility. Such a situation could be of no benefit to plaintiff. The burden rested upon him to show by substantial evidence the distance in which defendant, in the exercise of the highest degree of care, could and should have seen decedent. The testimony on that score, even when interpreted as broadly as contended by plaintiff, failed to establish that distance.

■ But moreover, and equally important for the reason stated in the opinion, plaintiff's case failed upon another ground wholly independent of the ground above stated, to wit: the clearly established fact that defendant could not have swerved his car to avoid striking decedent without materially endangering his own life.

We have carefully considered the remaining assignments of plaintiff's motion for rehearing or, in the alternative, for transfer to court en banc and find them without merit. The motion is overruled.